**In re Gerard R. SORLUCCO d/b/a Highlands Wood Products, Debtor.**

**Terrie HARMAN, Trustee, Plaintiff,**

v.

**Carol G. SORLUCCO, Defendant.**

**Bankruptcy No. 84–225.
Adv. No. 85–25.**

United States Bankruptcy Court,
D. New Hampshire.

Dec. 31, 1986.

Malone, Dorfman, Tauber & Sohn, P.C., Freeport, N.Y., for defendant.

Michael Moyers, Concord, N.H., for defendant.

Connie Rakowsky, Concord, N.H., for trustee, plaintiff.

Terrie Harman, Portsmouth, N.H., Trustee for debtor.

Victor Dahar, Manchester, N.H., Atty. for debtor.

## MEMORANDUM OPINION

JAMES E. YACOS, Bankruptcy Judge.

The trustee in bankruptcy in this adversary proceeding has attacked certain transfers made by the debtor, Gerard R. Sorlucco, to his ex-wife, Carol G. Sorlucco, in conjunction with a pending divorce proceeding between the parties in the New York state court system. The transfers in question occurred both before and after the filing of the debtor's bankruptcy petition in this court on June 5, 1984.

The New York proceeding was commenced by issuance of a summons early in June of 1983. After various negotiations the parties and their attorneys met in March of 1984 in a conference in which it was agreed that Mrs. Sorlucco would get the Long Beach, New York marital home and a 1982 Volvo automobile that she had been using. It was also agreed that Mr. Sorlucco would provide alimony and child support—the amount of which was left to subsequent negotiation. It was further agreed that Mr. Sorlucco would get full title to jointly-owned real property in Littleton, New Hampshire, comprising some 172 acres and a house used in a lumber business operated on the side by the debtor, together with release of any claims Mrs. Sorlucco might have to a rental property owned by the debtor in Marblehead, Massachusetts. Mrs. Sorlucco also agreed at that time to release her joint interest in a note and mortgage on a Bethlehem, New Hampshire property which permitted the debtor to obtain an additional $4,867.50 free for his own use in an imminent sale of that property.

The debtor did execute a deed to the Long Beach property to his wife which was recorded on April 4, 1984. Mrs. Sorlucco executed a deed to the Littleton property on April 12, 1984, and executed a releasing accord document on the Bethlehem property on April 20, 1984. Negotiation on the alimony and support obligations were concluded a year later and on March 11, 1985 a stipulated divorce settlement agreement was executed by the parties. A divorce decree was entered in the New York State proceeding on April 10, 1985 adopting the agreement.

Under this decree, which was obtained without any attempt to lift or modify the automatic stay from the pending bankruptcy proceeding, Mrs. Sorlucco released all claims to the Littleton and Marblehead properties. Mr. Sorlucco transferred his title interest in the Volvo automobile to his wife. Mr. Sorlucco retained a 1980 Saab automobile as his own property. All furnishings, appliances and personal property located at the Long Beach residence were determined to be the sole property of the wife. All furniture, furnishings and personal property located at the Littleton and Marblehead properties were determined to be the sole property of the husband. Finally, the husband was directed to pay alimony in the amount of $1,600 per month and child support in the amount of $300 per month.

## TRUSTEE'S ATTACKS

The trustee's basic contention is bottomed on the assertion that the Long Beach property had an equity of $62,511.81, one-half of which was owned by the debtor, in the amount of $31,255.91. The trustee contends that the debtor received nothing in exchange for his tender of the deed to the New York property other than an essentially worthless release of the defendant's interest or claims to the Littleton, New Hampshire, and Marblehead, Massachusetts property. The trustee concedes that the debtor did receive $4,867.50 from the contract for deed on the Bethlehem, New Hampshire property. The trustee however argues that there was no equity in the other properties as of the date of the transfer of the Long Beach property. The trustee therefore concludes that the debtor gave up his interest in the Long Beach property equity of $31,255.91 for a total consideration of $4,867.50, and that such exchange did not produce reasonably equivalent value in the transaction.

The trustee first attacks the transfer as a fraudulent transfer under § 548(a)(2)(A)

and (B)(i) of the Bankruptcy Code. Under this provision a transfer occurring within one year before bankruptcy is voidable when the trustee can prove that the debtor "received less than a reasonably equivalent value in exchange for such transfer or obligation" and it is further shown that the debtor was insolvent on the date of the transfer or was rendered insolvent as a result of the transfer.

The trustee also attacks the transfer under § 548(a)(2)(A) and (B)(iii) of the Code. Under that section the touchstone is receipt of less than reasonably equivalent value and that the debtor "intended to incur, or believed that the debtor would incur debts that would be beyond the debtor's ability to pay as they matured."

The trustee contends alternatively that the transfer is voidable as a preferential transfer pursuant to the provisions of § 547(b) of the Bankruptcy Code. This section deals primarily with the payment of antecedent debts within 90 days of filing of bankruptcy that enable such an existing creditor to receive more than a creditor would otherwise receive in the bankruptcy proceeding. The trustee contends that the transfer of the Long Beach property within some sixty-one days prior to the bankruptcy filing was on account of a "antecedent debt" owing to the wife in conjunction with the divorce proceeding and therefore comes within the preferential statute.

Finally, the trustee contends, as to the transfers which were effectuated *after* the filing of the bankruptcy petition, i.e., the transfers under the settlement agreement of March 11, 1985, as incorporated in the divorce decree of April 9, 1985, that such transfers are avoidable as unauthorized post petition transfers under §§ 549(a) and 550(a) of the Bankruptcy Code.

## FACTUAL BACKGROUND

The parties stipulated to a "Agreed Statement of Facts" in this proceeding and the facts so recited are hereby incorporated by reference and will not be restated here. At trial, numerous documentary exhibits were received and both parties testified.

Testimony was also received from the attorneys who represented the debtor and Mrs. Sorlucco in the New York divorce proceedings. Testimony was also received from a banker involved with the Littleton, New Hampshire property, and from a certified public accountant who examined the debtor's financial condition and net worth during the times in question.

Several key facts are clearly established by the evidence in this record that undercut the basis for the trustee's various attacks upon the transfers in question. One, there was no indication to either the debtor or Mrs. Sorlucco in March of 1984 that the debtor shortly would have to file a bankruptcy petition. Two, the trustee has failed to prove the debtor was insolvent at the time of the deeding of the Long Beach property to Mrs. Sorlucco. Three, Mrs. Sorlucco clearly could have received more property from the debtor under New York's "equitable distribution" divorce law but chose not to do so for noneconomic reasons.

### Bankruptcy Filing

On first blush it would appear that there must have been some indication at the time of the April 4, 1984 recording of the deed of the Long Beach property that the debtor was in failing financial circumstances which resulted in his bankruptcy filing some sixty-one days later on June 5, 1984. However the evidence received at trial indicates otherwise.

The debtor was and is an airline captain receiving a relatively high salary. He had dabbled in real estate investments in various locations, including the rental property in Marblehead and the lumber operation in Littleton. The Littleton operation was generating large monthly cashflow which was used by the debtor with not too much concern for its short-term actual profit and loss position. The debtor was counting on a further rollover of 1982 SBA financing for that operation, which he expected to receive at the time of the Long Beach deed.

A change in SBA policy thereafter resulted in a denial of the rollover, and precipitated a failure of that operation and the necessity of filing a bankruptcy petition for debts involved with regard to the business. The evidence establishes that the debtor was in fact paying all bills and expenses as they became due prior to the deeding of the Long Beach property.

### Insolvency At Time of Transfer

For like reasons the court finds that there was no sufficient showing of insolvency, which is the burden of the trustee in this context, at the time of the bankruptcy filing. For reasons well set out in the post-trial memorandum of the defendant, the accountant's analysis fails to take into consideration important asset factors to show a total picture as of the April 4, 1984 date of transfer. That analysis itself does not focus on specific data as to that date but depends on various assumptions and extrapolations. It also gives no weight to the going-concern value and prospects for "turning the corner to profitability" of the Littleton lumber operations *as they existed at that time.* The subsequent reversal of the normal SBA policy in rolling over financing to encourage new enterprises could not, and simply was not, contemplated by anyone in April of 1984. Without restating them here, the court adopts as its own findings of fact on insolvency the calculations of solvency set forth in the defendant's post-trial memorandum.

### Equitable Distribution Rights

The distribution agreed upon by the debtor and Mrs. Sorlucco in a New York divorce proceeding cannot really be understood without considerable weight being given to certain key facts regarding their marriage. They were married on April 9, 1960 in New York and had three children in their marriage. During the course of that marriage the debtor invested marital assets in various business enterprises, apart from his airline employment, in amounts in excess of $150,000. The marriage began to fail in the last five years of its duration due to the debtor's long absences from Long Beach in conjunction with his activities in Littleton and Marblehead. Those activities included living with another women at those locations.

The divorce decree entered by the New York court summarizes the break up of the marriage in the following key findings:

(a) The defendant is an airline pilot, flying out of Boston. Despite the fact that his home airport is in Boston, Massachusetts, he has consistently refused, over the past years, to move the family to Boston, despite repeated requests by the plaintiff. As a result, the defendant has spent very little time with the family, has failed to take an interest in the welfare of the children, has refused to participate in the raising or disciplining of the children, and has generally abdicated his responsibilities as husband and father.

(b) That the defendant is possessed of a violent temper, and over the course of the marriage and with increasing frequency during the past five years, has precipitated arguments with the plaintiff, during the course of which arguments the defendant has used violent, abusive language.

(c) That for the past five years, the defendant has taken an annual ten-day ski trip in January of each year. Despite repeated requests by the plaintiff, the defendant has refused to take the plaintiff on these vacation trips, informing her that she was not welcome.

(d) Over the past five years, defendant has insisted on handling all the family finances, has consistently refused to keep the plaintiff informed as to family finances, and has refused to allow the plaintiff access to the checking account.

(e) When the defendant leaves on a flight for his employer, U.S. Air, he will be gone anywhere from to two to four days. Prior to leaving on these trips, the defendant never informs the plaintiff in advance as to when she can expect him home, which leads to a very unsettled home life.

(f) That the defendant has squandered and wasted marital assets in various business ventures, causing the plaintiff extreme anxiety and concern.

(g) That as a result of the foregoing conduct by the defendant, plaintiff has become nervous, suffered anxiety, humiliation and embarrassment, all to the extent that it is unsafe, improper and impossible for the plaintiff to continue to cohabit with the defendant.

Far from Mrs. Sorlucco blithely giving up her rights to the Littleton and Marblehead properties because she knew they had no equity value, as the trustee contends, the fact is that she gave up any claim to those properties for the noneconomic reason that she simply did not want to have anything to do with properties used by the debtor while living with the other woman. She had no reason to believe, on the facts known to her, that those properties were not worth a sufficient amount in equity value to balance the property she would receive in the divorce proceeding.

Moreover, under the facts relating to this marriage and its dissolution, she would have been entitled under the New York equitable distribution divorce law to a "greater than fifty-fifty split" of existing assets in view of the dissipation of prior marital assets by the debtor in his business enterprises. She was in fact advised by her own attorney that she was demanding "too little" in the divorce.

## LEGAL CONCLUSIONS

The only attack by the trustee that deserves extended legal analysis and commentary in my opinion is the attack under § 548(a)(2)(A) and (B)(i) of the Bankruptcy Code dealing with transfers involving receipt of less than "reasonably equivalent value" in exchange for the transfer at a time when the debtor was insolvent or rendered insolvent by the transfer.

The other § 548 ground is not sustainable since there was no evidence that the debtor "intended to incur" debts during the applicable period within the meaning of the statute. Likewise, the post-petition trans-

fer attacks under §§ 549 and 550 ride or fall with the trustee's fraudulent transfer attack, aside from any fees, costs, and or any other sanctions that may be imposed upon the defendant for moving forward in the divorce court without seeking a lifting of the automatic stay imposed by the bankruptcy filing. I accept as my own findings of fact the values of the assets subject to the post-petition transfers as set forth in the defendant's post-trial memorandum.

■ The alternative contention and attack as a preferential transfer under § 547 also is not applicable since no "antecedent debt" within the meaning of that statute was involved. No case decision has been cited applying § 547 in a divorce context. While the initiation of divorce proceedings obviously calls into being various claims and contentions between the parties, as to this distribution of assets and ongoing support obligations, no final creation or determination of such inchoate obligations occurs until the final settlement and/or trial of the divorce proceeding. In this regard, I subscribe to the general view expressed by the district court in *Soroka v. Kaplan,* Case No. 80–C–528, Slip Opinion [Available on WESTLAW, DCTU database] [access Lexis] (N.D.Ill., January 5, 1982):

> The jurisdiction of the divorce court to dispose of marital property does not depend on legal rights in property, either immediate or prospective; it is incident to the power to dissolve marriages. The trustee could not have initiated the divorce action, could not have intervened and could not have required its dismissal. The divorce court had the authority to consider a number of factors in determining what, if anything, should be granted to the husband, and until that court acted the expectancy of the husband was even more inchoate, uncertain and personal than the interest of a spouse in a community property state. See *In re Cummings,* 84 F.Supp. 65 (S.D.Calif.1949).

■ Turning to the remaining fraudulent transfer attack under § 548 by the trustee, the short answer is that attack also must fail because the trustee failed to

meet her burden of showing insolvency at the time of the transfer by the preponderance of the evidence. However, in view of the importance of the question, and for judicial economy in the event my finding in that regard might be overturned in any appeal, I will set forth my further conclusions, assuming for the moment that insolvency existed, and that the focus then turns to the question of whether a lack of reasonably equivalent value for the transfer was shown. I will also assume for this purpose, contrary to my solvency finding, that the realty assets retained by the debtor lacked equity value as contended by the trustee.

■ In that posture, this case presents the dilemma of trying to apply fraudulent transfer concepts normally applied in commercial settings—in which a "snapshot picture" of the dollar value of the assets transferred and received is weighed by the bankruptcy court—to the noncommercial context of a divorce proceeding. In the latter context, various subtle and inchoate "property rights" exist between the marital parties but are not clearly defined or actually determined until the event of dissolution of the marriage occurs.

The trustee would like this court to take a "snapshot" view of the exchanges between the parties as of the 1984–1985 divorce proceeding, and conclude in strictly dollar-terms that an equal exchange did not occur. The defendant on the other hand contends that the court must consider the entire history of the marriage and all the factors that would be weighed by the divorce court in determining whether an equal exchange, or some other splitting of the existing assets, was equitable under the family law policies of the state involved.

It has been established by various case decisions that the fact that a transfer occurs in the context of the divorce proceeding does not immunize such transfer from a § 548 attack by a trustee in bankruptcy for one of the marital partners. See, e.g., *Gray v. Snyder*, 704 F.2d 709 (4th Cir. 1983); *In re Lange*, 35 B.R. 579 (Bankr.E.

D.Mo.1983), and cases cited therein. It is also clear that where a trustee can show an "actual intent to hinder, delay, or defraud" creditors in the context of an impending bankruptcy proceeding the transfer can be voided in the divorce context under § 548(a)(1) of the Bankruptcy Code. *Soroka v. Kaplan*, supra.

, In the present case the trustee has not attempted to mount an "actual intent" attack upon the transfers in questions. This leaves for this court the difficult question of trying to reconcile the conflicting policies of the Bankruptcy Code and the family law of a state in this context. There is very little help on this question from the existing case law. There is some appreciation of the complexity of the problem indicated in dicta in the pre-Code case of *Britt v. Damson*, 334 F.2d 896, 903 (9th Cir. 1964).

In my judgment Congress by use of the language *"reasonably* equivalent value" has provided sufficient flexibility for reconciling the different public policy purposes between the state and federal laws. I believe that the bankruptcy standard in this context should be interpreted to require only a "surface determination" by the bankruptcy court that the division of marital property between the divorcing parties was within the range of likely distribution that would be ordered by the state divorce court if the property division had actually been litigated in that state court. In the present case I have no doubt that the distribution agreed upon by the debtor and Mrs. Sorlucco would have been within the range of such distribution in an actual litigated divorce proceeding.

I realize that the approach I take here is not supported by any existing case law. However, the alternative is for the bankruptcy court in effect become a court of "de novo divorce jurisdiction" to reexamine and redetermine the balancing of various choate and inchoate marital rights and interests in property—to determine whether what the nondebtor spouse "gave up" was equal to what that spouse received as a result of the divorce decree. I cannot be-

lieve that Congress intended bankruptcy courts to have that overreaching, overarching function with regard to the state courts in family law matters.

There is no escape from that alternative, if the approach taken above is not used, since modern divorce statutes are increasingly becoming more sophisticated in evaluating the rights and claims of the marital partners to various properties—based on the *entire history* of the marriage in question. The New York statutes constituting New York as a "equitable distribution" state provide as follows:

*New York Domestic Relations Law, § 236(B)(5)(c).*

[Upon dissolution of the marriage] property acquired during the marriage should be distributed in a manner which reflects the individual needs and circumstances of the parties, regardless of the name in which such property is held. *McKinney's 1980 Session Laws of New York,* p. 1863.

*New York Domestic Relations Law, § 236(B)(1)(c).*

[Marital property is] all property acquired by either or both spouses during the marriage and before the execution of a separation agreement or the commencement of a matrimonial action.…

New York also provides in § 236(B)(5)(d) of the Domestic Relations Law some ten factors, to be considered by the divorce court in equitably distributing marital property, as follows:

1. the income and property of each party at the time of marriage, and at the time of the commencement of the action;

2. the duration of the marriage and the age and health of both parties;

3. the need of a custodial parent to occupy or own the marital residence and to use or own its household effects;

4. the loss of inheritance and pension rights upon dissolution of the marriage as of the date of dissolution;

5. any award of maintenance under subdivision six of this part;

6. any equitable claim to, interest in, or direct or indirect contribution made to the acquisition of such marital property by the party not having title, including joint efforts or expenditures and contributions and services as a spouse, parent, wage earner and homemaker, and to the career or career potential of the other party;

7. the liquid or non-liquid character of all marital property;

8. the probable future financial circumstances of each party;

9. the impossibility or difficulty of evaluating any component asset or any interest in a business, corporation or profession, and the economic desirability or retaining such asset or interest intact and free from any claim or interference by the other party;

10. any other factor which the court shall expressly find to be just and proper.

While it may have been true in earlier times that "title" and "ownership" of various assets between marital partners would be given considerable weight by a divorce court, that clearly is not true under a statute such as that which took effect in 1980 in the State of New York. Accordingly, a simple inquiry as to whether the nondebtor spouse released her rights to child support and alimony, in consideration for transfers of property in a divorce proceeding, is no longer adequate in my judgment.

The appropriate inquiry, if a bankruptcy court were forced to undertake it, would be exactly equivalent to the function of the divorce court in making a sophisticated and refined analysis as to the history of the marriage, the circumstances of the parties, their individual future prospects, and all other factors impinging upon the marital rights of the parties consistent with the family law policies of the state involved. Such would be required before any meaningful determination of what the nondebtor spouse "gave up" in the divorce settlement could be made. It is for this reason that I find no escape from becoming a de novo

divorce court if I do not take the "surface determination" approach described above.

That approach does not leave the creditors of the bankrupt spouse unprotected from wrongful transfers. It must be shown that the property division was the result of arms-length bargaining in the light of the likely range of distribution that the divorce court might order if the matter went to a contested trial. Settlements reached in the shadow of an imminent bankruptcy filing would raise a clear factual question as to the bona fides of such bargaining. Moreover, as indicated above, the trustee under other provisions of § 548 can recover transfers occurring in any divorce proceeding on a showing of actual intent to hinder, delay or defraud without establishing a lack of reasonably equivalent value in the transfers. Transfers made on the eve of bankruptcy involving a deliberate attempt to delay or defraud creditors are separately attackable under that provision.[1]

The trustee does make an appealing argument that the defendant, unlike the trustee, has the opportunity to seek adjusted compensation from the future earnings of the debtor, if this court were to nullify the property distribution decreed by the divorce court, since the defendant can seek a reopening of the question of the appropriate level of alimony and support in the divorce court due to changed circumstances, i.e., the recovery of assets by a trustee in bankruptcy. Cf. *In re Danley*, 14 B.R. 493 (Bankr.D.N.M.1981) (discharge of property settlement obligation in bankruptcy justifies reopening of alimony obligation). However, this argument loses its appeal in the § 548 context when one considers that it still would require the bankruptcy court in effect to make a de novo determination of an appropriate distribution of marital assets under the family policy of the state involved.

## CONCLUSION

For all of the foregoing reasons, this court concludes that the trustee's various attacks upon the transfers in question must fail and a separate judgment to that effect will be entered. The judgment will reserve jurisdiction in this court to determine any claim for fees, costs, and/or any other sanctions the trustee may wish to pursue with regard to the conduct of the defendant and her attorneys in proceeding in the state court to obtain post-bankruptcy transfers in the divorce proceeding without any lifting of the automatic stay.

## FINAL JUDGMENT

This proceeding having come on for trial upon the Amended Complaint filed herein by the plaintiff-trustee in bankruptcy on October 7, 1985, and the Answer thereto filed by the defendant Carol G. Sorlucco on October 29, 1985; and the court having set forth separately its findings of fact and conclusions of law in its Memorandum Opinion entered herein this date; it is accordingly

ORDERED, ADJUDGED and DECREED as follows:

1. Judgment is hereby entered in favor of the defendant and the relief requested by the plaintiff in the aforesaid Amended Complaint is hereby denied.

2. Each party shall bear their own fees and costs in this proceeding, subject to the following special provision. Plaintiff shall have 30 days from date within which to bring before this court her contention that some or all of her fees and costs should be assessed against the defendant, in view of the asserted deliberate violation of the automatic stay. The court notes in this regard that the indication of deliberate violation appears only in an affidavit of Peter W. Greenleaf, Esquire, attached without leave of this court to the Response Memorandum of Law filed by the plaintiff in this proceeding after the trial and close of evidence. The court does not consider that affidavit properly part of the evidentiary record in this proceeding.

---

1. It should also be noted that creditors dealing with the husband can also protect themselves by the simple expedient of requiring that the wife also become obligated on the transaction.

3. In the absence of any filing by the plaintiff of a motion for assessment of fees and costs within the time specified in paragraph two above, this adversary proceeding shall be deemed to be closed.