| DEBTOR IN POSSESSION | Hours Expended | Fees Billed For Quarter | Monthly Payments On Fees Billed For Quarter | Expenses Billed and Paid For Quarter | Unpaid Balance of Fees Requested | Total Fees and Expenses Requested for This Quarter |
|---|---|---|---|---|---|---|
| OFFICIAL COMMITTEE OF UNSECURED CREDITORS | | | | | | |
| Committee Members | — | $ 0.00 | $ 0.00 | $ 6,112.20 | $ 0.00 | $ 6,112.20 |
| Deasy & Dwyer | 283.80 | 41,718.60 | 31,288.95 | 2,077.46 | 10,429.65 | 43,796.06 |
| Kramer, Levin, Nessen, Kamin & Frankel | 2,045.64 | 429,881.20 | 322,410.90 | 93,394.17 | 107,470.30 | 523,275.37 |
| Skadden, Arps, Slate, Meagher and Flom | 206.50 | 49,034.00 | 36,775.50 | 3,834.00 | 12,258.50 | 52,868.00 |
| Total | 2,535.94 | 520,633.80 | 390,475.35 | 105,417.83 | 130,158.45 | 626,051.63 |
| OFFICIAL COMMITTEE OF EQUITY SECURITY HOLDERS | | | | | | |
| Committee Members | — | 0.00 | 0.00 | 1,759.56 | 0.00 | 1,759.56 |
| Whitman & Ransom | 1,210.00 | 271,750.50 | 203,812.88 | 68,041.92 | 67,937.62 | 339,792.42 |
| Baker & Botts | 86.50 | 25,375.00 | 19,031.25 | 2,688.08 | 6,343.75 | 28,063.08 |
| Total | 1,296.50 | 297,125.50 | 222,844.13 | 72,489.56 | 74,281.37 | 369,615.06 |
| Total This Page | 3,832.44 | 817,759.30 | 613,319.48 | 177,907.39 | 204,439.82 | 995,666.69 |
| Total Page 1 | 8,760.26 | 1,626,012.63 | 1,286,178.64 | 149,090.43 | 339,833.99 | 1,775,103.06 |
| GRAND TOTAL | 12,592.70 | $2,443,771.93 | $1,899,498.12 | $326,997.82 | $544,273.81 | $2,770,769.75 |

**In re R. Richard RISO, Debtor.**

**Victor DAHAR, Trustee, Plaintiff,**
**v.**
**Beatrice RISO, Defendant.**

**Bankruptcy No. 84–340.**
**Adv. No. 84–104.**

United States Bankruptcy Court,
D. New Hampshire.

June 30, 1989.

John L. Britton, Britton & Kantner, P.A., Ft. Lauderdale, Fla., for Victor Dahar.

Wayne C. Beyer, Cleveland, Waters and Bass, Concord, N.H., for Beatrice Riso.

## MEMORANDUM OPINION

JAMES E. YACOS, Bankruptcy Judge.

Plaintiff in this adversary proceeding is seeking either recovery of assets or judgment in the amount of $327,147.00 from the defendant as a result of the asserted lack of reasonably equivalent value in the property division reached by the debtor and his wife in conjunction with a pre-bankruptcy divorce proceeding. The plaintiff trustee has attacked as voidable under § 548(a)(2) of the Bankruptcy Code certain transfers included in a property settlement agreement executed on January 9, 1984 by the debtor and his wife prior to the voluntary chapter 7 bankruptcy petition filed by the debtor on June 7, 1984.

The trustee also attacks the transfers in question under § 544(b) of the Bankruptcy Code, incorporating in this instance his rights under Florida Statutes Annotated § 726.01, but inasmuch as the requisite elements for voidability raised on the facts in this case are identical under both the Federal and Florida Statute this decision will refer only to the Bankruptcy Code provision.

Under § 548(a)(2)($A$) it is necessary that the trustee establish that the transfers attacked resulted in the debtor receiving "less than a reasonably equivalent value" in exchange for the transfers. It is also necessary, under § 548(a)(2)($B$), that it be established that the debtor was insolvent on the date of the transfers or became insolvent as a result of the transfers. As to the latter requirement, there is no dispute in the present case regarding insolven-

Victor Dahar, Manchester, N.H., trustee.

cy as a factor. Accordingly, the issue before the court is a determination of reasonably equivalent value.

It should be emphasized at the outset that an actual intent to defraud is not an element in the present adversary proceeding. In a prior adversary proceeding in this case the major creditor in this estate, Donald H. Francis, brought a complaint seeking a general denial of the debtor's discharge under § 727(a)(2)(A) alleging that these transfers occurred with the actual intent to defraud. That adversary proceeding resulted in a final judgment by this court denying the objection to discharge and determining that the debtor, R. Richard Riso, did not have an actual intent to defraud with regard to these same transfers in conjunction with the divorce proceeding. See In re Riso, 74 B.R. 750 (Bankr.D.N.H.1987).[1]

The circumstances surrounding the divorce property settlement in question were set forth in my prior opinion dealing with the discharge objection; are incorporated herein by reference; and will not be set forth at length again in this opinion. Briefly, however, the salient facts involve a property settlement agreement entered into by the debtor and his then-wife on January 9, 1984, following the filing of a divorce proceeding by the wife (here the defendant), in Florida on December 27, 1983.[2] Donald Francis had previously, on October 20, 1983 received an arbitration award in certain litigation pending in New Jersey between himself and Richard Riso,

in an amount of $1,913,404.00, which was ultimately affirmed by the U.S. District Court for the District of New Jersey on March 22, 1984. The conjunction of these two events, and certain other circumstances, indicated the possibility of a sham divorce and attempt at evasion of Francis' judgment by the divorce property settlement, but it was determined in the prior adversary proceeding that the divorce between Richard Riso and the present defendant was in fact a true divorce and that no sham or actual fraud was involved. See In re Riso, 74 B.R. at 758.[3]

The application of § 548 of the Bankruptcy Code in a divorce property settlement context raises certain unique questions relating to the inchoate nature of a husband's and wife's property rights in an "equitable distribution" state—as is Florida—that this court has previously addressed in some length in its decision in In re Sorlucco, 68 B.R. 748 (Bankr.D.N.H.1986). As indicated, Florida is an "equitable distribution" jurisdiction. Canakaris v. Canakaris, 382 So.2d 1197 (Fla.1980).

Accordingly, there are two key issues presented for decision in the present case: (1) What were the actual values of the various assets retained by Richard Riso and Beatrice Riso as a result of the divorce property settlement; and (2) Was the agreed division of properties pursuant to that agreement, and the actual values here determined, within the range of expectable results in a contested Florida divorce proceeding on the history and circumstances of their marriage? [4]

1. While as indicated the present adversary proceeding does *not* involve any issue with regard to the debtor's intent with regard to the property settlement in the divorce proceeding, the pleadings and briefing in the present matter do include numerous references on both sides as to the bonafides of both Richard Riso and his wife in conjunction with the divorce settlement. Those questions have been finally determined by the prior adversary proceeding and judgment and may not be relitigated here in any event. Donald Francis, the plaintiff in that action, is a creditor holding in excess of 91 percent of the total general claims against this bankruptcy estate and is in every sense in privity with the trustee in the present adversary proceeding. As such he and the trustee are bound by the prior

determination. However, as indicated above, in the judgment of the court those issues are not raised by the present adversary complaint.

2. The property settlement agreement between Richard Riso and his wife was ultimately incorporated into a Final Judgment of Divorce entered by the Circuit Court of Collier County, Florida on April 12, 1984.

3. This finding also is binding upon the present plaintiff-trustee for the same reasons indicated in footnote No. 1, supra.

4. With regard to the second issue, a bankruptcy court can do a "surface determination" in the sense of an "expectable range of possible re-

## THE ACTUAL VALUES (OTHER THAN MAYBROOK)

The property division pursuant to the January 9, 1984 agreement is well summarized in an Annex to Plaintiff's Initial Post–Trial Brief, which will also be an Annex to this opinion. This summary indicates concisely the differing values for the assets in question as listed first by the Risos and then as asserted by the plaintiff. The agreement of January 9, 1984, as executed by the Risos, listed properties totalling assigned values of $1,300,465.00. Of this amount, items totalling $635,414.00 were transferred to Beatrice Riso, and items totalling $665,051.00 were transferred to Richard Riso.

With regard to the items held by Beatrice Riso following the divorce settlement agreement, the plaintiff asserts that the actual value of those items, together with some omitted items, is $668,414.00. I agree with the plaintiff in this regard and find and conclude that the value of the items retained by Beatrice Riso did in fact total $668,414.00 in actual value, as of the January 9, 1984 agreement, and also as of the date of the Final Judgment of Divorce on April 12, 1984. It is clearly established by the evidence that there must be added to the listing on the agreement certain shares of Diamond Shamrock Stock worth $3,000.00; and that a property located in Goodland, Florida that had been inherited by Beatrice Riso from her father was also omitted and should be added (for equitable distribution purposes), which property has an actual value of $30,000.00. These corrections therefore add $33,000.00 to the total listed for Beatrice Riso in the January 9, 1984 agreement.

With regard to the items retained by Richard Riso under the divorce agreement, the plaintiff contends that their total value is only $25,221.00 rather than the $665,051.00 total value listed. The major difference is the plaintiff's contention that the $500,000.00 in value assigned to the corporate stock held by the debtor in Maybrook, Inc. was actually worthless during the relevant time period. Richard Riso held 100 shares in Maybrook, Inc., which at the time represented a 50 percent interest in the corporation. The other 50 percent interest was owned by Ivar W. Malstrom.[5] The question of the valuation of the Maybrook, Inc. stock will be considered at some length below.

The plaintiff asserts that notes receivable held by Richard Riso from Malstrom and Francis in the amounts of $26,500.00 and $59,551.00 respectively, were in fact worthless during the relevant time periods and should not have been listed as having any actual value on Richard Riso's side of the property distribution. In view of the $1.9 million judgment obtained by Francis against Malstrom and Riso, jointly and severally, and in view of the fact that both Riso and Malstrom filed bankruptcy petitions in June of 1984 as a direct result of the final affirmance of that judgment, I find and conclude that the plaintiff is correct in this regard and that those items should be valued at zero for present purposes. Neither bankruptcy estate has assets remotely sufficient to cover the Francis claim, and thus neither debtor could give any realistic value to what in effect was simply an offset to the claim of Francis following the obtaining of his judgment.

sults" as delineated in the decision in *In re Sorlucco,* supra, at pp. 753–54.

5. Prior to being removed from his corporate duties and being denied further access to the corporation in January of 1984, by the joint action of Riso and Malstrom, Donald Francis likewise had held 100 shares of stock in Maybrook, Inc. Francis has off and on in this case asserted that following the 1983 arbitration award he still retained some stock interest in Maybrook, Inc. However, he has never given any convincing explanation as to how his stock interests survived the arbitration proceeding and judgment he obtained against Riso and Malstrom, which compensated him in the amount of almost two million dollars (on an original investment in 1978 of $175,000.00) for the wrongful loss of his investment and rights to future profits by the actions taken against him by Riso and Malstrom. In any event, the present case has been tried to this court on the basis that Riso's stock interest represented 50 percent ownership in Maybrook, Inc. during the relevant time period and I find that that in fact was the case.

With regard to Richard Riso's interest in a pension plan from his former employment with the Stepan Company, the plaintiff contends that that interest should only be valued at $13,066.92 rather than the $75,000.00 listed by Richard Riso and his wife on the January 9, 1984 agreement. The trustee's position is to the effect that only the amount vested and reachable for the bankruptcy estate should be listed. In fact the plaintiff did recover the sum of $13,066.92 on that ground. See *Dahar v. Harris Trust and Savings Bank*, 79 B.R. 138 (Bankr.D.N.H.1987). However, I do not find any legal or factual reason to support the trustee's contention in this regard. Riso valued his pension rights in terms of the minimum number of years guaranteed that he could select as an option under his pension plan. Under that option it is clear that he would be entitled to a total sum of $75,000.00. In fact under another option, Riso could elect a fixed sum per month for the balance of his life, and considering his life expectancy as his age of 70 in 1984, the actual value of his pension rights to him based on that life expectancy would be $106,296.00. I conclude for present purposes that his pension plan rights should in fact be valued at $106,296.00 notwithstanding his lower listing of a value for those rights on the January 9, 1984 agreement.[6]

The defendant contends that there should also be added to Richard Riso's side of the ledger the sum of $39,400.00 attributable to a joint liability owned by Beatrice and Richard Riso to the BayBank of Boston, Massachusetts, which was secured by the shares of Stepan Chemical Company stock retained by Beatrice Riso under the divorce settlement. Beatrice Riso did in fact pay off the BayBank loan out of her own funds to protect her interest in the Stepan stock. I agree with the defendant's

contention in this regard and accordingly $39,400.00 in actual value should be added to the list of items or benefits obtained by Richard Riso as a result of the settlement agreement.

## THE ACTUAL VALUES (MAYBROOK STOCK)

The foregoing rulings leave for further determination the question of the actual value of the Maybrook, Inc. stock held by Richard Riso during the relevant time period, i.e., December 9, 1984 to April 12, 1984. This indeed was the major focus of the litigation before me and resulted in a voluminous record of exhibits together with extended testimony by experts on both sides, as well as by other witnesses. It will be useful at the outset of the discussion of this issue to set aside some portions of the record which I find and conclude are irrelevant to the determination of actual value here required.

There is extensive testimony and documentary evidence in this record, submitted by both parties, with regard to the respective positions of Donald Francis and Richard Riso in the 1982–1983 litigation in New Jersey. With regard to the assertions by Francis in that litigation, as to the great value of the Maybrook Company and its rosy future and financial prospects, I conclude that that evidence is simply irrelevant for present purposes, since it was based upon financial history and projections relating to Maybrook as of the end of 1981 (immediately prior to Francis' departure from the company) which was the last year for which Francis submitted any financial data to the arbitrators.[7] Likewise, the assertions by Riso and Malstrom of low value to Maybrook, within and with regard to the New Jersey litigation, are not usable here

---

6. It must be remembered that the issue before this court is whether the plaintiff-trustee *in his own right* can invalidate transfers under § 548(a)(2) of the Bankruptcy Code—based solely on objective standards as to actual value and whether reasonably equivalent value was obtained—and not upon any concept of admissions or estoppel by Richard Riso, the debtor, in the circumstances.

7. It may well be questioned why neither the parties nor the arbitrators saw fit to include in the record the financial performance of Maybrook during 1982 and 1983, in order to determine an appropriate award to Francis with regard to his departure from the company. However, that gap in evidence does not in any way provide independent evidence of value of Maybrook as of 1984 for present purposes in this court.

as admissions, and have no independent evidentiary effect with regard to the objective question of actual value of Maybrook in 1984 that this court must determine. Finally, the various "offers" to purchase an interest in Maybrook in 1983 and 1984, as put into evidence by the defendant, do not in my judgment have any weight in establishing actual values per se, in terms of the prices discussed, due to various uncertainties and contingent factors involved. They do have some relevance in supporting an inference as to the going concern nature of the Maybrook corporation, as will be discussed further below.

The relevant evidence for present purposes began with the conflicting testimony of two experts on valuation of closely-held corporations. The plaintiff presented Joseph Finn as an expert witness, who expressed the opinion that the Maybrook stock as of January 9, 1984 was worthless. Finn reached this opinion on the basis that Maybrook should be valued on a liquidation basis only, in that it was likely to go out of business or go into bankruptcy within a year of that date. Accordingly, he gave no value to the good will or other intangibles relating to the business. On a strict asset-liability analysis he found that there was no net equity in the business.

While the court found Finn qualified to express an opinion, and indeed he has extensive experience in valuing businesses, I must conclude that his opinion and analysis in the present case is fundamentally flawed due to an incorrect assumption underlying his view, i.e., that only liquidation value was appropriate. The record is repleat with evidence indicating that Maybrook, Inc. was in fact a going concern in January of 1984 and that it had substantial good will, customer lists, access to various desirable markets, and other intangibles that should have been taken into account in the valuation of the company.[8]

It is true that, following the departure of Francis in January of 1982, and the commencement of the bitter litigation between Francis and Riso–Malstrom, the profitability of Maybrook declined substantially, according to standard financial accounting reports. However, the record also establishes that a large part of that decline was attributable to extraordinary expenses with regard to the New Jersey litigation, as well as the distraction from "tending to business" on the part of both Riso and Malstrom that led to the decline. The gross sales of Maybrook actually increased every year from its founding in 1976 through and including 1984.

In January of 1984, there was in fact in the real world no indication that Maybrook would collapse.[9] Its financial statements, as of the fiscal year ending on October 31, 1983, prepared after an audit by Maybrook's outside certified public accountants, indicated a net book equity of $201,198.00. The certified public accountants' report gave no qualification as to the ongoing nature of the business. Riso and Malstrom at the time discussed buying out each other's interests at a $500,000.00 level. Jeffrey Brooks and Andrew Banham, as new employees brought into the company during the summer of 1983, were interested in acquiring a 10 percent interest in Maybrook for $100,000.00. Malvin Horst, representing a California company made several trips to New England in the fall of 1983, and continuing into the summer of 1984, to negotiate a possible purchase of Maybrook at a $1,000,000.00 price. Horst spent some $15,000.00 to $20,000.00 in pursuing the analysis and possible purchase of the company. He negotiated first with Riso and then, following Riso's personal bankruptcy filing in June of 1984, continued the negotiations with Francis. Francis wanted more for the company than the

---

8. Maybrook was on the approved list of those lanolin suppliers that companies like Revlon, and others accepted as potential suppliers; Maybrook did have a good reputation in industry; Maybrook also had an advantageous supplier arrangement with regard to its lanolin materials; and Richard Riso was well known and respected in the cosmetic ingredient industry.

9. Testimony of Ivar Malmstrom and Andrew Banham was presented by plaintiff to support a contrary view but was directly contradicted by Richard Riso. I find the testimony of Riso the more credible.

$1,000,000.00 that Horst was discussing and the deal never went through.

As indicated above, the Horst negotiations do not in my view establish a specific value for Maybrook during the period in question, but they do corroborate that Maybrook was perceived in the industry as a going concern, and specifically that Richard Riso's knowledge, expertise, and reputation in the industry was considered a valuable intangible asset of Maybrook, Inc.

Maybrook, Inc. in fact has never collapsed or gone out of business. It was operated through November of 1984 by Richard Riso, and was operated thereafter by Francis as manager after Riso was removed by the two trustees acting jointly in the Riso and Malstrom bankruptcies. In November of 1984 Francis after returning to the business argued to Maybrook's lending institution, BayBank, that Maybrook's affairs could be turned around and that Maybrook in fact was worth approximately $1,000,000.00.[10] A year later, in November of 1985, Francis purchased the Maybrook stock from the trustees of both the Riso and Malstrom bankruptcies and thereafter operated the company as the sole shareholder.[11]

The court's conclusion above that the liquidation value approach employed by Finn was unjustified is not altered by Finn's reference to Publication No. 34: Statement on Auditing Standards, "The Auditor's Considerations When A Question Arises About An Entity's Continued Existence", published by the American Institute of Certified Public Accountants (1981), or his reliance on the "Z–Score model" that was originally developed in the late 1960's and discussed by Associate Professor Edward I. Altman in his book *Corporate Financial Distress* (John Wiley & Sons, Inc. 1983). See also Altman, *The Prediction of*

*Corporate Bankruptcy, A Discriminant Analysis* (Garland Publishing 1988). Neither of these publications have any meaningful applicability to the unique facts of the Maybrook business. That is, the Maybrook business was essentially sound and well-positioned in industry, but mismanaged and drained due to the strife and litigation between the shareholders. An outside buyer would ignore such factors— as indeed did Horst and Francis himself. Furthermore, both publications are subject to qualifications that render them of little aid for present purposes.

Publication No. 34 from the American Institute of C.P.A.'s notes the following:

In forming an opinion on the financial statements, the auditor considers any such contrary information, together with any factors tending to mitigate that information and any management plans for dealing with the underlying conditions.

In this context contrary information includes information that comes to the auditor's attention, at any time through the date of his report, relating to an entity's ability, at the date of the financial statements, to continue in existence. The ... examples of contrary information vary widely in importance, and some may have significance only when viewed in conjunction with others....

The "Z–Score model" is the term used for the final result of a "multiple discriminant analysis" which was developed by Professor Altman and described in both his 1983 and 1988 books. The Z–Score is calculated by taking into account four financial ratios, i.e., working capital divided by total assets; retained earnings divided by total assets; earnings before interest and taxes divided by total assets; and net worth divided by total liabilities. *Transcript,* March 2, 1988, p. 121. Those particular

---

**10.** Defendant's Exhibit 107, p. 344.

**11.** Francis paid $100,000.00 into the Riso bankruptcy to acquire the 50 percent interest in Maybrook owned by Richard Riso. However, due to the nature of the transaction as structured by Francis—including a side-acquisition of certain Maybrook assets by Amerchol Corporation—together with Francis' overpowering ability to outbid any potential outside acquirer

by virtue of his $2,000,000.00 judgment debt, the actual price paid by Francis for the Maybrook stock has no independent significance for present purposes. See sale hearing record in this case, *Transcript,* September 3, 1985, pp. 28, 36, 38, 43; *Transcript,* September 9, 1985, pp. 60–63, 65–66, 70, 72, 99, 104, 110–12, 128–29, 140, 152.

ratios are then multiplied by a coefficient that was developed by Altman. The resulting "Z–Score" if less than positive 1.1 is said to indicate a likelihood of "bankruptcy" within one year. When Finn applied these ratios to Maybrook he came up with a Z–Score of negative .810. *Transcript,* March 2, 1988, p. 122. Finn then equated the negative Z–Score with a conclusion that Maybrook would not be an ongoing business. *Transcript,* March 2, 1988, p. 123.

The problem with Finn's uncritical reliance on the Z–Score for purposes of valuing Maybrook is that he took no account of the obvious qualifications in Altman's work as to both the concept of "bankruptcy" involved and the lack of reliability of the Z–Score as a valid predictor for small firms having assets of less than $1 million dollars.

Both of Altman's books rely for empirical data in support of Z–Score predictability on an examination of 66 corporate reorganization proceedings commenced under Chapter X of the former Bankruptcy Act during the period 1945–1965. The mean asset size of these firms was $6.4 million, with the range of between $.7 million and $25.9 million.[12] See Altman, *opus cited,* 1983, p. 104; Altman, *opus cited,* 1988, p. 40.

Altman expressly decided not to attempt to focus on "small firms" having less than $1 million dollars in total assets:

> An important issue is to determine the asset-size group to be sampled. The decision to eliminate both the small firms (under $1 million in total assets) and the very large companies from the initial sample essentially is due to the asset range of the firms in Group 1. In addition, the incidence of bankruptcy in the large-asset-size firm was quite rare prior to 1966. (As we have illustrated in Chapter 1, however, the large firm is no longer invulnerable to financial distress.) The absence of comprehensive data negated the representation of small firms.

A frequent argument is that financial ratios, by their very nature, have the effect of deflating statistics by size, and that therefore a good deal of the size effect is eliminated. The Z-score model, discussed below, appears to be sufficiently robust to accommodate large firms. [Altman, *opus cited,* 1983, p. 105]

In his 1988 book, based upon the same empirical sampling, Altman concludes with a "suggestion for further research" in which he comments in part:

> Care was taken throughout, not to imply that the suggested model is the optimum predictor of bankruptcy. Also, the model's effectiveness for very small firms and firms with total assets of over $25 million was not established. The former group was not analyzed due to lack of available data for such companies while the occurrence of bankruptcy in the latter size group is not frequent. This raises the question of where future research efforts might be most effectively utilized. Large commercial banks write off millions of dollars of uncollectable loans each year and have access to a great deal of information on these failing firms. Most of the firms involved are in the small firm category mentioned above. [Altman, *opus cited,* 1988, p. 131]

Thus, while the "Z–Score" may someday be useful in predicting a business failure regarding small firms in the nature of the Maybrook corporation involved in the present case, that financial ratio analysis method has not yet reached the point of any predictive reliability based upon relevent empirical data and analysis. In addition, even if the Z–Score analysis were deemed appropriate for a small firm such as Maybrook, the relevant financial ratios should have been calculated *after* adjustment to remove the distorting effects of the extraordinary legal and accounting expenses and the excessive compensation paid to officers. Finn did not make such

---

**12.** Only two of the 66 firms selected had assets of less than $1 million dollars—even in terms of 1945–1965 dollars. Corporations that filed petitions under Chapter X of the prior Bankruptcy Act were usually fairly large public corporations who had public reporting requirements under the Security and Exchange Act. This gave Altman easy access to the necessary financial data for the ratios used in calculating his Z–Score device.

adjustments in calculating the Z–Score for Maybrook. *Transcript*, March 2, 1988, pp. 155; 164, 171, 190.

Finally, and as a rather large qualification of the relevance of the "Z–Score" for present purposes, it should be noted that Altman apparently defines "bankruptcy" loosely in terms of corporate reorganization petitions rather than straight bankruptcy liquidation proceedings. Indeed, Altman nowhere defines bankruptcy precisely other than by the inference that can be made from the selection of bankruptcy proceedings used in his empirical study. The fact that a corporation may be forced to seek reorganization under Chapter X (now chapter 11) of the bankruptcy laws obviously is not by itself any indication that the corporate entity has no going concern value and must be liquidated. Reorganization proceedings are for the express purpose of rehabilitation of a troubled enterprise. Indeed, the factional strife between partners often is "cured" by the expediant of a bankruptcy reorganization proceeding under which they may be forced to set aside their differences in order to realize the maximum value of the enterprise by a sale to an outside party. Accordingly, the use of the Z–Score by Finn, even if it were relevant to the Maybrook situation, does not support the further conclusion that Maybrook was not an ongoing entity and would have to be liquidated within one year.

For all of the above reasons I conclude that Maybrook, Inc. was in fact viable in the January 9 to April 12, 1984 time period. Its problems were largely attributable to the distraction of the Francis litigation, the draining of corporate funds to cover that litigation, and the simple lack of good management skills on the part of both Riso and Malstrom—as contrasted with the better financial performance when in the hands of a better business manager such as Francis. Such a business enterprise, when viewed by a potential outside acquir-er, would result in a discounting of the temporary aberration regarding the Francis litigation and the mismanagement by the present managers. This would also include the history of excessive compensation drawn by Riso and Malstrom, prior to, and after, the departure of Francis. An outside party would disregard those factors in making an objective evaluation of the essential nature and profitability of the business when properly managed.[13] Essentially that was the approach taken by Horst and accounted for his continued interest in acquiring the business notwithstanding various adverse developments in 1984.

It also is worth noting that while Maybrook, Inc. suffered some serious setbacks in the summer of 1984 those adverse events were not things that could clearly be anticipated in the January–April period of 1984. Following the filing of the personal bankruptcies by Riso and Malstrom in June of 1984, Malstrom and Brooks left Maybrook, taking another employee with them, and set up a competing business. This also resulted in depriving Maybrook of an advantageous relationship with a supplier of lanolin raw materials closely related to Malstrom. Notwithstanding these adverse events, however, Maybrook still survived as indicated above and has continued in operation to the present.

Accordingly, I give no weight to the testimony and opinion of Finn with regard to the value of Maybrook, Inc., inasmuch as his opinion was based solely on a liquidation approach assuming that Maybrook would not continue as a going concern. While Finn did refer "hypothetically" to alternative value approaches, it is clear from the record that his basic opinion was in terms of an enterprise doomed to collapse and without any regard to goodwill or other intangible values. See *Transcript*, March 2, 1988, pp. 122–23, 125, 134, 144–45, 154–55, 157, 169–70. Moreover, Finn clearly viewed the perceived strife between Riso and Malstrom (as re-

---

**13.** The contention by plaintiff that Riso was only a 50 percent owner and had to have Malstrom's agreement for a sale is not material. Once Francis obtained his $1.9 million arbitrators' award against them both, Malstrom had little option as to agreeing to a sale (either directly or through a bankruptcy or reorganization process) in the event he and Riso were unsuccessful in preventing the award from going to judgment.

ported to him by Francis) as the *most* important factor in his valuation of Maybrook. *Transcript*, March 2, 1988, p. 126.

The defendant for its part submitted as an expert witness one David Ferrari, who also has extensive experience in valuing closely-held business enterprises. While there were some flaws and errors in his analysis, as will be pointed out below, in substance I find his opinion of value more pertinent to the present case—with certain qualifications.

Taking a "multiple of book value" approach, Ferrari started with the net worth as of October 31, 1983 of $201,200.00 (pursuant to the audited financial statements) and then proceeded appropriately to add back into value the costs of litigation improperly paid out of the corporate assets in 1982, in the amount of $37,030.00, and in 1983 in the amount of $181,345.00, relating to the Francis litigation. In addition, Ferrari also appropriately added back into book value excess compensation drawn by Riso and Malstrom in 1981 of $123,000.00 less tax effect netting $63,210.00 of added book value; and excess compensation in 1982 of $12,667.00 less tax effect netting $6,500.00 in added book value. These additions provided Ferrari with an adjusted book value of Maybrook, Inc. as of October 31, 1983 of $489,285.00. However, Ferrari neglected to give tax effect to the "backing out" of the 1982 and 1983 costs of litigation figures set forth above. Applying the same approximate 50 percent ratio of tax effect to those amounts, those added value items should be $18,515.00 (instead of $37,-030.00) and $90,673.00 (instead of $181,-345.00) which would result in a more appropriate adjusted book value as of October 31, 1983 of $380,098.00. Ferrari also neglected to deduct from this adjusted book value figure a loss totalling $43,100.00 by Maybrook in November and December of 1983 (following the fiscal-year ending in October) which would further reduce adjusted book value for present purposes to $336,998.00. On the entire record I believe that a multiplier of two and one half times

such adjusted book value is appropriate for purposes of determining the actual value of Maybrook, Inc.—thus giving value to Maybrook's place in the industry, its good will, its proprietary formulas, its reputation, and its other intangibles. This multiplier produces a total value for Maybrook, Inc. of $842,495.00.

Using an alternative "capitalization of earnings" approach, Ferrari appropriately in my judgment adjusted the prior actual earnings records to "backout" excessive compensation and extraordinary inappropriate expenditures (just as an outside buyer would do) and also appropriately used a weighted average earnings analysis for the prior five years giving more weight to the more recent years. This approach, on the performance history of Maybrook as thus adjusted, indicates $83,568.00 weighted average earnings for the prior five years. Applying an appropriate multiplier of 10 times earnings, as supported by the record, this would indicate a value for Maybrook, Inc. as of January of 1984 of $835,680.00.[13a]

The court finds and concludes that the value of the total ownership interest in Maybrook, Inc. as of the January 9 to April 12, 1984 time period was $840,000.00. Richard Riso, holding a 50 percent ownership interest, accordingly can be allocated $420,000.00 of this value for his 100 shares of stock. However, in view of the lack of control represented by the 50/50 split of ownership, I find and conclude that a 25 percent control discount should be applied to Richard Riso's interest, giving a final actual value for Richard Riso's 100 shares of Maybrook, Inc. stock during the relevant time period in the amount of $315,000.00.

### REASONABLY EQUIVALENT VALUE (§ 548)

The foregoing determinations of actual values of those items of property included in the divorce property settlement distributions between Richard Riso and the defendant result in actual value of items retained by Beatrice Riso in the amount of $668,414.00, and actual value of items re-

---

**13a.** The plaintiff's own expert witness, Joseph Finn, recognized that a multiplier of 10 was an appropriate factor in this regard. *Transcript*, March 2, 1988, pp. 170–71.

tained by Richard Riso in the amount of $476,480.00.[14]

On the basis of a total value of $1,144,894.00 of property involved in the divorce settlement transfers, the foregoing distribution of actual values between Beatrice Riso and Richard Riso represent a ratio of 58 percent of value going to Beatrice Riso and 42 percent of value going to Richard Riso.

It is now necessary to determine whether that division of values and transfers between Richard Riso and his wife, in conjunction with the divorce proceeding, resulted in a receipt by Richard Riso of property reasonably equivalent in value for the properties transferred by him to his wife. This raises the question of applying § 548 of the Bankruptcy Code in the divorce context, with the peculiar problems of dealing with "transfers" between a husband and wife having inchoate rights in marital assets, regardless of title or other legal technicalities, as discussed in this court's decision in *In re Sorlucco*, 68 B.R. 748 (Bankr. D.N.H.1986). In accordance with the approach adopted in *Sorlucco* it is also necessary to make a surface determination as to what the likely result would be under Florida law had Beatrice Riso and Richard Riso resorted to a contested divorce proceeding relating to the division of their marital property in the Florida courts.

This court noted in *Sorlucco* that its "surface determination" approach resulted from the dilemma of trying to apply fraudulent transfer concepts normally applied in commercial settings to divorce proceedings in states having "equitable distribution" marital laws:

> The trustee would like this court to take a "snapshot" view of the exchanges between the parties as of the 1984–1985 divorce proceeding, and conclude in strictly dollar-terms that an equal exchange did not occur. The defendant on the other hand contends that the court must consider the entire history of the

marriage and all the factors that would be weighed by the divorce court in determining whether an equal exchange, or some other splitting of the existing assets, was equitable under the family law policies of the state involved.

\* \* \* \* \* \*

In my judgment Congress by use of the language *"reasonably* equivalent value" has provided sufficient flexibility for reconciling the different public policy purposes between the state and federal laws. I believe that the bankruptcy standard in this context should be interpreted to require only a "surface determination" by the bankruptcy court that the division of marital property between the divorcing parties was within the range of likely distribution that would be ordered by the state divorce court if the property division had actually been litigated in that state court. In the present case I have no doubt that the distribution agreed upon by the debtor and Mrs. Sorlucco would have been within the range of such distribution in an actual litigated divorce proceeding.

\* \* \* \* \* \*

While it may have been true in earlier times that "title" and "ownership" of various assets between marital partners would be given considerable weight by a divorce court, that clearly is not true under a statute such as that which took effect in 1980 in the State of New York. Accordingly, a simple inquiry as to whether the nondebtor spouse released her rights to child support and alimony, in consideration for transfers of property in a divorce proceeding, is no longer adequate in my judgment.

The appropriate inquiry, if a bankruptcy court were forced to undertake it, would be exactly equivalent to the function of the divorce court in making a sophisticated and refined analysis as to the history of the marriage, the circumstances of the parties, their individual

**14.** The Richard Riso tabulation includes $315,000.00 for the Maybrook stock, $106,296.00 for his pension plan rights, $4,000.00 in his IRA account, $39,400.00 attributable to the BayBank loan assumed and paid by Beatrice Riso, and $11,784.00 with regard to an income tax refund not reflected on the original schedule and ultimately collected by Richard Riso.

future prospects, and all other factors impinging upon the marital rights of the parties consistent with the family law policies of the state involved. Such would be required before any meaningful determination of what the nondebtor spouse "gave up" in the divorce settlement could be made. It is for this reason that I find no escape from becoming a de novo divorce court if I do not take the "surface determination" approach described above. [68 B.R. at pp. 753–54]

It is true that in *Sorlucco* I also noted that divorce property settlements reached "in the shadow of an imminent bankruptcy filing" would be subject to special scrutiny as to the bonafides of any asserted arm's-length bargaining. 68 B.R. at 755. However, in the present case no question of actual intent is raised since the trustee is relying only on § 548(a)(2). Moreover, and in any event, the court will reach its result here in terms of the objective actual values determined above, and in terms of the range of results that could be expected from a non-bargained *litigated* divorce proceeding and marital property division between the debtor and his wife in Florida had no such agreement been reached.

Florida is in fact an "equitable distribution" state, based on Florida caselaw. *Canakaris v. Canakaris*, 382 So.2d 1197 (Fla.1980). The relevant statute, Section 61.08, Florida Statutes, gives a trial judge authority to:

> grant alimony to either party, which alimony may be rehabilitative or permanent in nature. In any award of alimony, the court may order periodic payments or payments in lump sum or both.... In determining a proper award of alimony, the court may consider any factor necessary to do equity and justice between the parties.

In *Canakaris*, the appellate court recognized that a trial judge may award both periodic alimony and an equitable distribution of the marital property, which the court called "lump sum alimony". *Id.* at 1201. Florida courts also recognize "special equities", a term used to describe interests in property brought into the marriage or acquired during the marriage through a spouse's contribution of services or funds over and above normal marital duties. *Id.* at 1200. Subsequent to the *Canakaris* decision, the Florida courts further recognized that an "equitable" distribution did not necessarily require an "equal" distribution and that, upon a showing of "special equities", one spouse could be favored over the other in a distribution of assets in a divorce. See *Tronconi v. Tronconi*, 425 So.2d 547 (Fla.App.1982), *aff'd* 466 So.2d 203 (Fla.1985).

One such "special equity" recognized by the Florida courts is a wife's contributions to the success of a family business, which entitle the contributing spouse to greater consideration in a distribution of marital assets than a non-working, non-contributing spouse. See, e.g., *Jackson v. Jackson*, 507 So.2d 1160 (Fla.App.1987); *Driggers v. Driggers*, 452 So.2d 113 (Fla.App.1984); and *Neff v. Neff*, 386 So.2d 318 (Fla.App. 1980).

Defendant contends that under the Florida equitable distribution standard "most decisions in Florida favor awarding the marital home and alimony or liquid assets to the wife, and business interests, if any, to the husband, without trying to achieve exact equivalence in value, [and] where the home is the only substantial asset, generally it is awarded to the wife." *Defendant's Post–Trial Brief,* filed July 11, 1988, p. 76, citing *Dewberry v. Dewberry*, 455 So.2d 420 (Fla.App.1984) (marital home and cash to wife; substantial business interests to husband); *DiPrima v. DiPrima*, 435 So.2d 876 (Fla.App.1983), *review denied*, 447 So.2d 886 (Fla.1984) (home and $3,000 per month alimony to wife, resulting in $700,-000 lump-sum of $2.6 million total net worth to wife); *Greer v. Greer*, 438 So.2d 535 (Fla.App.1983) (sustaining award of home and $1,000 per month alimony to wife, and reversing award of $136,500 interest in husband's business); *Philipose v. Philipose*, 431 So.2d 698 (Fla.App.1983) (condo, furnishings, $15,000 lump-sum alimony to wife); *Sanders v. Sanders*, 435 So.2d 372 (Fla.App.1983) (home to wife); *Thiel v. Thiel*, 426 So.2d 1212 (Fla.App. 1983) (home, $1,640 per month alimony, and

one half jointly-held assets to wife); *Young v. Young,* 431 So.2d 234 (Fla.App.1983), *appeal after remand,* 449 So.2d 980 (Fla. App.1984) (home to wife); *Locke v. Locke,* 413 So.2d 431 (Fla.App.1982) (home to wife); and *Neumann v. Neumann,* 413 So.2d 1203 (Fla.App.1982) (sustaining award of 70 percent of proceeds from sale of marital home and two properties to wife; business to husband).

These cases support the property settlement division agreed upon by Richard Riso and his wife, i.e., she got the marital home and the income-producing assets, with very little alimony, and he got the business assets and related pension plan because he would continue to be active and obtain approximately $80,000 in annual income.

As noted above, the total amounts of actual value retained by Richard and Beatrice Riso in the divorce property settlement distribution are $476,480.00 and $668,414.00 respectively, which represents a 42 to 58 split of the marital assets. The court finds that a 42 to 58 split that favors the wife is within the range of a likely outcome of a hypothetical contested divorce proceeding in the Florida courts upon the facts of this case.

Defendant cites several Florida cases in which the property awards favor the wife by a clear margin:

In *Bridges v. Bridges,* 506 So.2d 1047 (Fla.App.), *review denied,* 519 So.2d 986 (Fla.1987), the wife was awarded the home valued at $425,000, [the contents of] one of two apartments, and $2,000 per month [for 24 months] alimony. On appeal, the award was reversed, the court holding that she should also have been awarded a portion of $240,000 in joint assets. In *Gepfrich v. Gepfrich,* 510 So.2d 369 (Fla.App.1987), the husband made about $100,000 per year. His one-half interest in a business was valued at $500,000. On appeal, the court sustained an award to the wife of alimony of $3,500 per month, the home, and a lump sum of $270,000. In *De Cenzo v. De Cenzo,* 433 So.2d 1316 (Fla.App.1983), the court sustained an award of sixty percent of marital property (including

home) to wife, and reversed rehabilitative alimony to award total permanent alimony of $2,000 per month. In *Aylward v. Aylward,* 420 So.2d 660 (Fla. App.1982), the couple had assets in excess of $800,000. The wife was awarded the home, a lump sum of $150,000 and $3,500 per month alimony.

*Defendant's Post–Trial Brief,* filed July 11, 1988, p. 77.

It is true, and the defendant so notes, that Florida courts have occasionally rendered property awards that substantially favor the husband. See, e.g., *Price v. Price,* 389 So.2d 666 (Fla.App.1980), *review denied,* 397 So.2d 778 (Fla.1981) (court sustained lump sum award to wife of only $24,000 on husband's net worth of over $1 million); *Bryan v. Bryan,* 442 So.2d 362 (Fla.App.1983), *review denied,* 450 So.2d 485 (Fla.1984) (court sustained lump sum award of $35,000 on husband's net worth of $750,000 and her assets of $123,000); and *Sloman v. Sloman,* 418 So.2d 1249 (Fla.App.1982) (court sustained an award of only 38 percent of marital assets to wife).

Defendant presented the unrebutted expert testimony of Sanford Katz, Professor of Law, Boston College Law School. Among his credentials, Professor Katz is an expert on the law of marital property, the past Chairman of the Family Law Section of the American Bar Association, an Editor–in–Chief of the ABA's Family Law Quarterly, and he has taught family law since 1964. Professor Katz is the author of a casebook/treatise on family law entitled "American Family Law in Transition", of which one third of its cases are Florida cases.

Professor Katz testified that the property settlement between the Risos, as evidenced by the January 9, 1984 agreement, was "fair and reasonable" and that the settlement "would have been affirmed on appeal had a District Court so ordered it." *Transcript,* April 4, 1988, p. 144. Professor Katz explained the basis for his opinion:

I formed my opinion on the basis of studying appellate cases in Florida for the past several years, as well as looking

at the statute. Florida is an equitable distribution state and it has two peculiarities. Number one, it has been made equitable distribution by virtue of case law and it has the peculiarity of two concepts, one, special equities and two, special contributions. On the basis of the facts in this case and Schedule A that was given to me, it seems to me that given the history of this marriage, the length of the marriage, the contributions of each spouse that had made to the marital assets, the peculiarities of this relationship, that the more or less fifty-fifty split, Mrs. Riso getting slightly less, would have been appropriate in this case. In fact, a Florida case does say that while equitable distribution is not a mechanical process, it nonetheless probably begins with a fifty-fifty split and then the courts work from there. So that as I read the numbers in this case, it seems to me, once again, on the basis of the schedule given to me, the percentage slightly less for Mrs. Riso, I do think though that, in Florida, Mrs. Riso might have been awarded more alimony than she was given by the parties themselves in this case. From reading the cases, it seems to me that women in Florida tend to be protected with alimony decrees, and tend to be fairly treated.

*Transcript*, April 4, 1988, pp. 144–45.

Professor Katz further testified that, in valuing Richard Riso's interest in Maybrook, the divorce court would not have been bound by the valuation formula set forth in the stockholder agreement. *Transcript*, April 4, 1988, p. 149. Professor Katz also testified that, based upon her inheritences and uncompensated contributions to Maybrook, Mrs. Riso might have been awarded more than 50 percent of the marital assets. *Transcript*, April 4, 1988, p. 150.

Accordingly, on the basis of Florida case-law and the evidence presented to the court, including Professor Katz's testimony, the court finds that the division of values and the transfers between Richard Riso and his wife in conjunction with the divorce proceeding resulted in a receipt by Richard Riso of property reasonably equiv-

alent in value for the properties transferred by him to his wife, as required by § 548(a)(2)(A) of the Bankruptcy Code. The "reasonably equivalent" test does not require an exact equivalent. All that is required is a determination that the property settlement by the parties be within the range of a potential award in a hypothical contested divorce proceeding. The evidence establishes that the Riso's property settlement was within such a range.

The court's foregoing determination that the transfers are not voidable under § 548(a)(2) renders it unnecessary to decide whether defendant is entitled, as a good faith purchaser, to the "safe harbor" provisions of § 548(c) regarding nullified transfers.

An appropriate final judgment in accordance with this Memorandum Opinion shall be entered separately.