[No. S106586. Aug. 14, 2003.]

RHINA MEJIA, Plaintiff and Appellant, v.
DANILO REED et al., Defendants and Respondents.

**COUNSEL**

Anderson & Blake, Hannig Law Firm and John H. Blake for Plaintiff and Appellant.

Douglas B. Schwab for Jeffrey W. Little as Amicus Curiae on behalf of Plaintiff and Appellant.

Olimpia, Whelan & Lively, Olimpia, Whelan, Lively & Ryan, Gary L. Olimpia, Adam R. Bernstein; Robinson & Wood and Helen E. Williams for Defendant and Respondent Danilo Reed.

Law Offices of Vanessa A. Zecher and Vanessa A. Zecher for Defendant and Respondent Violeta Reed.

## OPINION

**KENNARD, J.**—Danilo Reed (Husband) had an extramarital relationship with plaintiff Rhina Mejia that led to the birth of a child. In a later divorce proceeding, Husband and Violeta Reed (Wife) entered into a marital settlement agreement (MSA) under which Husband transferred all his interest in jointly held real property to Wife. Plaintiff claimed that the purpose of this transfer was to prevent her from collecting child support, and she asked the court to impose a lien on the real property. The trial court rejected her contentions and entered summary judgment for Husband.

The Court of Appeal reversed the trial court, holding that a transfer of real property under an MSA could be found invalid under the Uniform Fraudulent Transfer Act (UFTA) (Civ. Code, §§ 3439–3439.12). Because that holding conflicted with another Court of Appeal decision, *Gagan v. Gouyd* (1999) 73 Cal.App.4th 835 [86 Cal.Rptr.2d 733], we granted review. We conclude that the Court of Appeal in this case correctly held that the provisions of the UFTA apply to MSA's.

That conclusion requires us to address an additional issue. Under the UFTA, a transfer can be invalid either because of actual fraud (Civ. Code, § 3439.04, subd. (a)) or constructive fraud (*id.*, §§ 3439.04, subd. (b), 3439.05); one form of constructive fraud is a transfer by a debtor, without receiving equivalent value in return, if the debtor is insolvent at the time of transfer or rendered insolvent by the transfer (§ 3439.05). The Court of Appeal held that there were triable issues of fact relating to both actual fraud and constructive fraud. Husband sought review only of the holding relating to constructive fraud.[1] That holding rested on the proposition that a person is insolvent under section 3439.05 if the person's assets are less than the discounted cumulative value of future child support obligations. ■ We disagree, and hold that the discounted value of future child support, because it is generally paid from future income rather than current assets, should not be considered in determining solvency under section 3439.05. We therefore reverse the judgment of the Court of Appeal and remand the case for further proceedings.

---

[1] Wife joined in Husband's petition for review and brief on the merits. She did not raise any separate arguments.

## I. FACTS AND PROCEDURAL HISTORY

The facts are taken from the Court of Appeal opinion. Husband and Wife were married in 1970. In 1994, Husband had an extramarital relationship with plaintiff. Their daughter was born in February 1995. In May 1995, Wife petitioned for dissolution of her marriage to Husband. They entered into an MSA under which Husband conveyed all his interest in the couple's real estate to Wife, and she conveyed her interest in Husband's medical practice to him. The MSA provided that Husband would be solely responsible for his extramarital child support obligation. The MSA was merged into a judgment of dissolution entered in August 1995.

By June 1997, Husband had abandoned his medical practice. He now lives with his mother. He has no assets and little income.

Plaintiff, who had a pending paternity suit against Husband, filed a lis pendens against the real property awarded Wife under the MSA. The trial court in the paternity action awarded plaintiff child support of $750 per month, but it ruled that plaintiff had no standing to challenge the transfer of property under the MSA. The court later increased child support to $953 per month plus $200 per month for day care, or a monthly total of $1153.

Plaintiff then filed this action, asserting that the MSA was a fraudulent transfer by Husband to Wife, intended to hinder plaintiff in her collection of future child support. The complaint sought to establish a lien upon the real property transferred under the MSA. (See Civ. Code, § 3439.07 [remedies of defrauded creditor].) Husband moved for summary judgment. His supporting papers did not expressly deny fraudulent intent, instead relying on plaintiff's failure to provide direct evidence of intent to defraud. Husband further declared that the value of his practice at the date of separation was $600,000, and consequently that the community property had been divided equally.

In response, plaintiff asserted that the transfer was accompanied by certain "badges of fraud" from which the trier of fact could infer intent to defraud. She presented an expert evaluation appraising the fair market value of Husband's medical practice at $100,000. Another expert calculated the discounted value of future child support at $164,829 to $205,975 on the assumption that child support, based on Husband's earning potential, would be set at $1146 to $1482 monthly (plus $200 per month for child care expenses). Under the lowest of these figures, the discounted value of future child support would still exceed the appraised value of Husband's practice.

The trial court assumed that the UFTA applied to the MSA, but it granted Husband's summary judgment motion on the grounds that no evidence was

presented of actual intent to defraud, and the transfer did not render Husband insolvent. The Court of Appeal reversed, holding that although the UFTA applies to MSA's, triable issues of fact precluded summary judgment.

## II. THE UNIFORM FRAUDULENT TRANSFER ACT APPLIES TO TRANSFERS UNDER MARITAL SETTLEMENT AGREEMENTS

The UFTA permits defrauded creditors to reach property in the hands of a transferee. The Family Code, in section 916, protects property transferred to a spouse incident to divorce from the debts of the other spouse. Neither statute expressly refers to the other. Our task is to harmonize the two statutes. (*DeVita v. County of Napa* (1995) 9 Cal.4th 763, 778–779 [38 Cal.Rptr.2d 699, 889 P.2d 1019].)

"Under well-established rules of statutory construction, we must ascertain the intent of the drafters so as to effectuate the purpose of the law. [Citation.] Because the statutory language is generally the most reliable indicator of legislative intent, we first examine the words themselves, giving them their usual and ordinary meaning and construing them in context." (*Esberg v. Union Oil Co.* (2002) 28 Cal.4th 262, 268 [121 Cal.Rptr.2d 203, 47 P.3d 1069].) "[E]very statute should be construed with reference to the whole system of law of which it is a part, so that all may be harmonized and have effect." (*Moore v. Panish* (1982) 32 Cal.3d 535, 541 [186 Cal.Rptr. 475, 652 P.2d 32].) "Where as here two codes are to be construed, they 'must be regarded as blending into each other and forming a single statute.' [Citation.] Accordingly, they 'must be read together and so construed as to give effect, when possible, to all the provisions thereof.' [Citation.]" (*Tripp v. Swoap* (1976) 17 Cal.3d 671, 679 [131 Cal.Rptr. 789, 552 P.2d 749].)

When the plain meaning of the statutory text is insufficient to resolve the question of its interpretation, the courts may turn to rules or maxims of construction "which serve as aids in the sense that they express familiar insights about conventional language usage." (2A Singer, Statutes and Statutory Construction (6th ed. 2000) p. 107.) Courts also look to the legislative history of the enactment. "Both the legislative history of the statute and the wider historical circumstances of its enactment may be considered in ascertaining the legislative intent." (*Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1387 [241 Cal.Rptr. 67, 743 P.2d 1323].) Finally, the court may consider the impact of an interpretation on public policy, for "[w]here uncertainty exists consideration should be given to the consequences that will flow from a particular interpretation." (*Ibid.*)

Following these principles of statutory construction, we turn first to the text of the UFTA and the Family Code.

## A. *The Statutory Texts*

### 1. *The Uniform Fraudulent Transfer Act*

The UFTA was enacted in 1986; it is the most recent in a line of statutes dating to the reign of Queen Elizabeth I. "This Act, like its predecessor and the Statute of 13 Elizabeth, declares rights and provides remedies for unsecured creditors against transfers that impede them in the collection of their claims." (Legis. Com. com., 12A West's Ann. Civ. Code (1997 ed.) foll. § 3439.01, p. 272.) Under the UFTA, a transfer is fraudulent, both as to present and future creditors, if it is made "[w]ith actual intent to hinder, delay, or defraud any creditor of the debtor." (Civ. Code, § 3439.04, subd. (a).) Even without actual fraudulent intent, a transfer may be fraudulent as to present creditors if the debtor did not receive "a reasonably equivalent value in exchange for the transfer" and "the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation." (Civ. Code, § 3439.05.)

On its face, the UFTA applies to all transfers. Civil Code, section § 3439.01, subdivision (i) defines "[t]ransfer" as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset . . . ." The UFTA excepts only certain transfers resulting from lease terminations or lien enforcement. (Civ. Code, § 3439.08, subd. (e).) Thus, the UFTA on its face encompasses transfers made under an MSA. Consequently, most decisions of other states construing parallel provisions of the UFTA hold that it does apply to marital property transfers, including those in connection with divorce. (See, e.g., *Scholes v. Lehmann* (7th Cir. 1995) 56 F.3d 750, 758–759 [applying Ill. law]; *Kardynalski v. Fisher* (1985) 135 Ill.App.3d 643 [482 N.E.2d 117, 121–122, 90 Ill.Dec. 410]; *Dowell v. Boyer* (Okla.Ct.App. 2000) 998 P.2d 206, 209, 212–213; *Greeninger v. Cromwell* (1996) 140 Ore.App. 241 [915 P.2d 479, 482]; see also *Federal Deposit Ins. Co. v. Malin* (2d Cir. 1986) 802 F.2d 12, 18 [under N.Y. law, UFTA applies but ex-wife was good faith purchaser for value]; but see *Britt v. Damson* (9th Cir. 1964) 334 F.2d 896, 901 [Wash. law]; *Witbart v. Witbart* (1983) 204 Mont. 446 [666 P.2d 1217, 1219].) Civil Code section 3439.11 provides expressly that the UFTA "shall be applied and construed to effectuate its general purpose to make uniform the law . . . among states enacting it."

Husband here points to section 10 of the UFTA (Civ. Code, § 3439.10), which provides: "Unless displaced by the provisions of this chapter, the principles of law and equity, including the law merchant and the law relating to principal and agent, estoppel, laches, fraud, misrepresentation, duress, coercion, mistake, insolvency, or other validating or invalidating cause,

supplement its provisions." He argues that Family Code section 916 is a law that "supplement[s]" the provisions of the UFTA by, in effect, establishing an exception to its provisions. But to "supplement" the UFTA means to provide something additional to the law, not to narrow or nullify the law. This point is illustrated in *Monastra v. Konica Business Machines, U.S.A., Inc.* (1996) 43 Cal.App.4th 1628 [51 Cal.Rptr.2d 528]. The defendants there argued that compliance with the Bulk Sales Act (Cal. U. Com. Code, § 6101 et seq.) immunized a transfer from attack under the UFTA. The Court of Appeal disagreed, concluding that the protections given creditors under the Bulk Sales Law supplemented, that is, added to the protections of the UFTA. (*Monastra v. Konica Business Machines, U.S.A., Inc., supra,* at pp. 1639–1640.)

### 2. *The Family Code*

Before 1984, a spouse who received community property after a dissolution of marriage was liable for the community debts incurred by the other spouse during the marriage. (*Dawes v. Rich* (1997) 60 Cal.App.4th 24, 28 [70 Cal.Rptr.2d 72]; see *Packard v. Arellanes* (1861) 17 Cal. 525; *Frankel v. Boyd* (1895) 106 Cal. 608, 612–615 [39 P. 939].) Thus, a creditor of one spouse could often reach any property transferred to the other without resorting to an action to set aside a fraudulent transfer. Nevertheless, that remedy was available when needed to invalidate a fraudulent transfer made under an MSA. (See, e.g., *McKnight v. Superior Court* (1985) 170 Cal.App.3d 291, 295–296, 299 [215 Cal.Rptr. 909].)

In 1984, however, the Legislature substantially changed the postmarital liability of spouses. "The Legislature determined that, under most circumstances, after a marriage has ended, it is unwise to continue the liability of spouses for community debts incurred by former spouses." (*Dawes v. Rich, supra,* 60 Cal.App.4th at p. 30.) It enacted former Civil Code section 5120.160, which provided in pertinent part that, upon the dissolution of the marriage, "the property received by [a married] person in the division is not liable for a debt incurred by the person's spouse before or during marriage, and the person is not personally liable for the debt, unless the debt was assigned for payment by the person in the division of the property." (Stats. 1984, ch. 1671, § 9, p. 6021.) When the Family Code was enacted in 1992, Civil Code section 5120.160 became Family Code section 916.

When the Legislature enacted former Civil Code section 5120.160, it contemplated that " '[i]n allocating the debts to the parties, the court in the dissolution proceeding should take into account the rights of creditors so there will be available sufficient property to satisfy the debt by the person to whom the debt is assigned, provided the net division is equal.' " (*Lezine v.*

*Security Pacific Fin. Services, Inc.* (1996) 14 Cal.4th 56, 75 [58 Cal.Rptr.2d 76, 925 P.2d 1002], quoting Recommendation Relating to Liability of Marital Property for Debts (Jan. 1983) 17 Cal. Law Revision Com. Rep. (1984) pp. 23–24, fn. omitted.) Family Code section 2550, however, provides: "*Except upon the written agreement of the parties*, or on oral stipulation of the parties in open court, or as otherwise provided in this division, in a proceeding for dissolution of marriage or for legal separation of the parties, the court shall . . . divide the community estate of the parties equally." (Italics added.) ■ Whenever, as in this case, the parties agree upon the property division, no law requires them to divide the property equally, and the court does not scrutinize the MSA to ensure that it sets out an equal division. (*In re Marriage of Cream* (1993) 13 Cal.App.4th 81, 91 [16 Cal.Rptr.2d 575].)

The only statutory exception to Family Code section 916's grant of immunity from liability is a provision that preserves the liability of property subject to a preexisting lien (Fam. Code, § 916, subd. (a)(2)); the statute does not mention fraudulent transfers. Thus, on its face, Family Code section 916 would appear to protect transfers of marital property incident to divorce from being set aside under the UFTA. We note, however, that section 916 states that it applies "[n]otwithstanding any other provision of this chapter." (Similar language appeared in former Civil Code section 5120.160.) This language indicates that section 916 may be subordinate to other statutes, such as the UFTA, not included in the same chapter of the Family Code as section 916.

B. *Canons of Statutory Construction*

The parties call our attention to familiar canons of statutory interpretation, but these offer no assistance in resolving the apparent conflict between the statutes at issue here. Husband argues that the principle that specific provisions take precedence over general provisions (see Code Civ. Proc., § 1859; *Collection Bureau of San Jose v. Rumsey* (2000) 24 Cal.4th 301, 310 [99 Cal.Rptr.2d 792, 6 P.3d 713]) is controlling. He asserts that Family Code section 916, because it discusses only transfers in an MSA, is more specific than the UFTA, which regulates all transactions, and should therefore prevail over the UFTA. But one could as easily describe the UFTA as pertaining to only fraudulent transactions, and thus at least as specific as section 916, which concerns all marital settlement transactions. Neither statute appears to be significantly more specific than the other.

Plaintiff bases her argument on the adage of *expressio unis est exclusio alterius*—the expression of some things implies the exclusion of things not expressed. She argues that the Legislature, when it enacted the UFTA, knew how to make a specific exemption for transfers under an MSA—since it made exceptions for some other transfers—and she asks us to infer from the

absence of an exception for marital settlements that the Legislature must have intended the UFTA to apply to marital settlement transactions. But one can equally argue that the Legislature, when it enacted former Civil Code section 5120.160 and later recodified that provision as Family Code section 916, knew how to make an exception for fraudulent transfers, but chose not to do so. Both the UFTA and the Family Code govern discrete subject areas, and the Legislature's failure to legislate expressly with respect to the rare instance in which they overlap does not suggest any legislative intent as to which should prevail.

## C.  *Legislative History*

Husband argues that the history of former Civil Code section 5120.160 (the predecessor to Family Code section 916) shows that the Legislature did not intend to allow creditors to challenge an MSA. In 1984, when the Legislature was considering former section 5120.160, Carol Bruch, a law professor at the University of California at Davis, proposed that the new law provide for notice to creditors and grant them a right to intervene in the dissolution proceedings. In connection with this proposal, she suggested amending the measure to provide that the section would not bar recovery by a creditor who was not notified, or did not approve the proposed marital settlement, and "successfully challenges the property division as a fraudulent conveyance in a motion to set aside the property division filed within 3 years after entry of the judgment dividing the property." (Carol Bruch, U.C. Davis Law School, Suggested Amendments to Assembly Bill No. 1460 (1983–1984 Reg. Sess.) Mar. 14, 1984.) The Law Revision Commission rejected Professor Bruch's suggested amendments, saying: "Carol proposes adoption of a 'bankruptcy' or 'probate' type scheme for imposing liability after dissolution of marriage, involving notice and an opportunity to appear for creditors, and fraudulent conveyance standards. While this scheme is theoretically interesting, the Commission rejected it because of the extensive procedures involved. It would transform simple divorce cases into elaborate proceedings involving many parties. We are unwilling to burden our bill with this; Carol can prepare and sponsor her own bill next session to adopt this sort of scheme if she is able to perfect it." (Nathaniel Sterling, Cal. Law Revision Com., letter to Assemblyman Alistair McAllister, Mar. 30, 1984, p. 2.) This historical account could support an inference that the Legislature did not intend to permit creditors to attack an MSA, as Husband contends, but it could also be viewed more narrowly as suggesting only a determination that creditors should not have standing to raise their claims in the dissolution proceeding itself.

The legislative history of the UFTA equally offers a weak inference in support of plaintiff's position. In 1986, when the Legislature considered the

UFTA, the Business Law Section of the California State Bar reported to the Legislature: "Serious consideration needs to be given to the effect of this statute in areas such as leveraged buyouts of businesses, *marital property agreements*, foreclosures sales of real property, to name a few examples." (Margaret Sheneman, State Bar of Cal. (Business Law Section), mem. to Judith Harper, Legis. Rep. on Senate Bill No. 2150 (1985–1986 Reg. Sess.) Apr. 30, 1986, p. 2, italics added.) The Legislature, however, added no provisions relating to marital property transfers.

In sum, both when it enacted former Civil Code section 5120.160 and when it enacted the UFTA, the Legislature was advised that difficulties could arise from the intersection of family law and laws prohibiting fraudulent transfers. In both cases, it chose not to address the subject with specific legislation. In these circumstances, we cannot draw any conclusions as to what the Legislature intended based on the absence of legislative action.

## D. *Policy Considerations*

The Court of Appeal here concluded that neither the language of the statutes nor their legislative history was dispositive, and that it would have to turn to an analysis of the relevant policy considerations as they bear on the question of legislative intent. The court that decided *Gagan v. Gouyd, supra,* 73 Cal.App.4th 835, also found that neither the statutory text nor legislative history was sufficient to resolve the conflict, requiring it to base its decision on policy considerations. We arrive at the same juncture.

The California Legislature has a general policy of protecting creditors from fraudulent transfers, including transfers between spouses. ██ A transfer before dissolution can be set aside as a fraudulent conveyance. (See Fam. Code, § 851 [transmutation of marital property subject to UFTA]; *Reddy v. Gonzalez* (1992) 8 Cal.App.4th 118, 122–123 [10 Cal.Rptr.2d 55, 10 Cal.Rptr.2d 58].) A transfer after dissolution can be set aside under the clear terms of the UFTA. When the court divides the marital property in the absence of an agreement by the parties, it must divide the property equally (Fam. Code, § 2550), which provides some protection for a creditor of one spouse only. In view of this overall policy of protecting creditors, it is unlikely that the Legislature intended to grant married couples a one-time-only opportunity to defraud creditors by including the fraudulent transfer in an MSA.

Husband puts forward two countervailing policy considerations. First, he argues that allowing MSA transfers to be considered fraudulent to creditors will complicate marital settlement negotiations. This contention is supported by *Gagan v. Gouyd, supra,* 73 Cal.App.4th at pages 842–843, which states:

"[A]s a matter of policy, we believe that to engraft the fraudulent transfer remedies onto a valid and approved marital settlement agreement would result in needlessly complicating the already emotionally laden dissolution process. It might result in the unraveling of a dissolution agreement painstakingly negotiated between the parties and their attorneys." We acknowledge Husband's contention, but we do not give it substantial weight. In our view, the parties' debts, and how to pay them, are matters that *should* be considered in marital settlement negotiations even if, like pension plans and income tax consequences, they make the process of reaching an agreement more complex.

Second, Husband argues that the state and the parties need to rely on the finality of dissolution judgments. ■ But California and federal law already permit such judgments to be set aside for fraud. Under state law, either spouse can attack the property division under a dissolution judgment on the ground that it was procured by extrinsic fraud. (Fam. Code, § 2122, subd. (a).) Under federal bankruptcy law, a bankruptcy trustee, acting in the interest of creditors, can set aside the property division of a dissolution judgment on the ground of fraud. (See *Britt v. Damson* (9th Cir. 1964) 334 F.2d 896, 902; *In re Hope* (Bankr. D.Colo. 1999) 231 B.R. 403, 415 & fn. 19, and cases cited.) Thus, while the law respects the finality of a property settlement agreement "that is not tainted by fraud or compulsion or is not in violation of the confidential relationship of the parties" (*Adams v. Adams* (1947) 29 Cal.2d 621, 624 [177 P.2d 265]), we find no legislative policy to protect such agreements from attack as instruments of fraud. ■

We therefore conclude, based on the policy considerations underlying the UFTA and the Family Code provisions governing dissolution judgments and settlements, that the UFTA applies to property transfers under MSA's.[2]

### III. THERE IS NO TRIABLE ISSUE OF FACT AS TO CONSTRUCTIVE FRAUD

The Court of Appeal found triable issues of fact as to both actual fraud and constructive fraud. On review here, Husband challenges only the issue of constructive fraud.

There are two forms of constructive fraud under the UFTA. Civil Code section 3439.04, subdivision (b) provides that a transfer is fraudulent if the debtor did not receive reasonably equivalent consideration and either "(1) Was engaged or about to engage in a business or a transaction for which the

---

[2] *Gagan v. Gouyd, supra,* 73 Cal.App.4th 835, is disapproved to the extent it is inconsistent with this opinion.

remaining assets of the debtor were unreasonably small in relation to the business or transaction; or [¶] (2) Intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due." Civil Code section 3439.05 provides that a transfer is fraudulent as to an existing creditor if the debtor does not receive reasonably equivalent value *and* "was insolvent at that time or . . . became insolvent as a result of the transfer . . . ." Only the form of constructive fraud defined in Civil Code section 3439.05 is at issue here.

Whether Husband here received equivalent value in the property division is a material disputed fact, as the trial court recognized. But constructive fraud under Civil Code section 3439.05 also requires that the transferor was insolvent at the time of the transfer, or rendered insolvent by the transfer. We find no triable issue of fact on the question of insolvency.

Under the UFTA's definition, a "debtor is insolvent if, at fair valuations, the sum of the debtor's debts is greater than all of the debtor's assets." (Civ. Code, § 3439.02, subd. (a).) ■ To determine solvency, the value of a debtor's assets and debts are compared. By statutory definition, a debtor's assets exclude property that is exempt from judgment enforcement. (Civ. Code, § 3439.01, subd. (a)(2).) Retirement accounts are generally exempt. (Code Civ. Proc., § 704.115; see *Yaesu Electronics Corp. v. Tamura* (1994) 28 Cal.App.4th 8, 13–15 [33 Cal.Rptr.2d 283].) Here, when Husband's exempt retirement account is excluded, his sole postdissolution asset is his medical practice. That practice had a value as low as $72,000 at the time of the dissolution, according to plaintiff's appraisal evidence.

Plaintiff argued that the trial court should compare the value of Husband's medical practice (his sole nonexempt asset) to the present value of the entire child support obligation (his sole debt), which plaintiff's expert estimated at between $164,829 and $205,975, and determine that Husband was insolvent after he executed the MSA. The trial court rejected plaintiff's argument on the ground that the unmatured portion of plaintiff's child support claim could not be fairly valued. The Court of Appeal disagreed. It held that Husband's child support debt should be taken into account at its present discounted value, and therefore it concluded that solvency, like consideration, was a triable issue of fact.

We disagree with the Court of Appeal's analysis. ■ Although the UFTA recognizes an unmatured contingent claim as a debt (Civ. Code, § 3439.01, subds. (b), (d)), child support claims present a special case. Support payments usually are paid from present earnings, not liquidation of preexisting assets. The amount of payments owed is computed on the basis of monthly disposable income. (Fam. Code, § 4055, subd. (a).) This figure is

generally based on actual earnings, although the trial court has discretion to consider earning capacity instead of actual income (Fam. Code, § 4058, subd. (b)), and child support payments may be changed, in some cases retroactively, if there is a change in actual earnings or earning capacity. (Fam. Code, § 3651, subd. (a); *In re Marriage of Laudeman* (2001) 92 Cal.App.4th 1009, 1015 [112 Cal.Rptr.2d 378].)[3]

█ Assets at the time of dissolution play little part in the computation of child support. They may enter indirectly into the calculation in two ways: (1) In assessing earning capacity, a trial court may take into account the earnings from invested assets (see, e.g., *In re Marriage of Cheriton* (2001) 92 Cal.App.4th 269, 292 [111 Cal.Rptr.2d 755]); and (2) a court may deem assets a "special circumstance" (Fam. Code, § 4057, subd. (b)(5)) that may justify a departure from the guideline figure for support payments (*In re Marriage of Loh* (2001) 93 Cal.App.4th 325, 332 [112 Cal.Rptr.2d 893]). But these are exceptional situations; the child support obligation is based primarily on actual earnings and earning capacity.

█ Income not yet earned, however, is not an asset under the UFTA unless it is subject to levy by a creditor, as would be the case if, for example, the transferor possessed a promissory note payable at a future date. (See Civ. Code, § 3439.01, subd. (a)(2); *Carter v. Carter* (1942) 55 Cal.App.2d 13, 15–16 [130 P.2d 186].) Thus, Husband's future earnings, or his future earning capacity, would not appear on the balance sheet to offset his child support obligation.

We have found no cases that consider whether future child support obligations constitute a debt under the UFTA. In their briefs, the parties discuss *In re Labrum & Doak, LLP* (Bankr. E.D.Pa. 1998) 227 B.R. 383, a bankruptcy case involving whether future lease payments could be considered a debt, apparently the closest analogy they could find to the present case. The court there said: "[I]t is logical not to include all of the future rents as liabilities because this calculation miscategorizes the future rent liability as an obligation presently due in full . . . . [T]his would render any business with substantial projectable future expenses artificially deemed insolvent." (227 B.R. at p. 389.) But the parties dispute the meaning of this language. According to Husband, the court held that rents not yet due were not liabilities, while plaintiff claims that the court was concerned about only the failure to reduce future rent payments to present value.

█ We conclude, however, that future child support payments should not be viewed as a debt under the UFTA. █ In construing statutes, we

---

[3] The statements in this paragraph and the following two paragraphs are generalizations. There are many specific provisions that affect the calculation of child support, and our generalizations are not intended to override or modify such specific provisions.

avoid any interpretation that will lead to absurd consequences. (*People v. Coronado* (1995) 12 Cal.4th 145, 151 [48 Cal.Rptr.2d 77, 906 P.2d 1232].) To treat future child support payments as a debt, while not viewing the earning capacity from which they will probably be paid as an asset, would yield an absurd result. Relatively few parents of young children have current assets sufficient to pay the present discounted value of years and years of future support obligations. Thus, treating future child support as a current debt would label many persons with child support obligations as insolvent under the UFTA even though they were current on their child support obligations and will be able to pay future obligations as they became due. This insolvency, moreover, is of a wholly artificial character, for the debtor cannot be compelled to convert future child support obligations into a present cash payment, and in fact generally cannot even voluntarily terminate liability for future support by paying the custodial parent the present value of such future payments. (See *In re Marriage of Cheriton, supra,* 92 Cal.App.4th 269.) No legislative purpose is served by treating a parent as insolvent because of child support obligations when that parent has paid all payments currently due and can pay future payments from future earnings or earning capacity.

In light of our conclusion that future child support payments should not be considered a debt under the UFTA,[4] Husband here was not insolvent at the time of the transfer nor was he rendered insolvent by the transfer. There is thus no triable issue of fact as to constructive fraud. Actual fraud, however, remains a triable issue for decision by the trial court.

## DISPOSITION

The judgment of the Court of Appeal is reversed, and the cause is remanded for further proceedings.

George, C. J., Baxter, J., Werdegar, J., Chin, J., Brown, J., and Moreno, J., concurred.

---

[4] This reasoning would apply equally to future spousal support payments. We take no position, however, on the classification of other contingent or installment payments.