STATE OF MAINE                                  SUPERIOR COURT
LINCOLN, ss.                                    CIVIL ACTION
                                                DOCKET NO.: WISSC-RE-18-2


SUSAN STORER                          )
                                      )
          Plaintiff,                  )
                                      )
     v.                               )          **JUDGMENT**
                                      )
DEAN W. JACOBS and                    )
SARAH A. PLUMMER                      )
                                      )
          Defendants.                 )


Trial was conducted in this matter on December 13, 2018. Plaintiff brought suit

under the Uniform Fraudulent Transfer Act §§ 3571-3582 ("UFTA").

## BACKGROUND

The following facts were established at trial: Defendant Dean Jacobs ("Dean")

purchased land at 85 Old County Road in Damariscotta in 1990 and subsequently built a

home there. 85 Old County Road ("Property" or "marital home") is the center of this

dispute. Dean married Defendant Sarah Plummer ("Sarah") in 2000. The two of them

treated the Property as their marital home and raised their two minor children there. The

Property remained solely in Dean's name for thirteen or fourteen years. In September

2002 Dean bought shares of a pharmaceutical company from John Higgins ("John") and

signed a promissory note for $1,040,000. Sarah was aware that Dean was purchasing a

business from John, but was not aware of the purchase price. Sarah became aware of the

purchase price sometime between 2010 and 2012. Through that time only interest

payments were made towards the debt and nothing was paid towards the principal.

In spring 2014, Dean told Sarah that John said he was going to sue him for the debt

owed. Sarah was upset because of how that would affect the family. In September 2014,

1

Sarah asked Dean to transfer a one-half interest of the Property to her. She had not been aware that she had no legal interest in the home she had been contributing to and raising a family in with Dean. Dean testified credibly that this was a marital decision, and he felt it was the right thing to do as Sarah had been living there for so many years. Dean made this transfer and recorded it in the Registry of Deeds. Dean did not believe he was insolvent at this time and was generally paying the family's living expenses and other bills as they came due. Sarah did not pay any monetary value for the one-half interest.

In May 2015, John and Dean entered into a settlement agreement in which Dean acknowledged that he owed John over $1.7 million. Sarah was generally aware of this agreement. Dean did not pay John all that was owed under the agreement. Dean paid John $100,000 but nothing more.[1]

Sometime in 2015, or the first half of 2016, Dean and Sarah's marriage deteriorated. In late June 2016 Sarah had filed a petition for judicial separation. In July 2016, they were still married but not living together in the marital home. Dean had moved out in the spring and was not welcome in the home. Sometime in July a sheriff came to the home to serve Dean with a lawsuit from John. This increased Sarah's concerns about maintaining the marital home for her minor children. In July 2016, at Sarah's request, Dean transferred his remaining one-half interest in the Property to Sarah and recorded it with the Registry of Deeds.[2] At the time of the transfer, Dean knew the marriage was uncertain but was hoping to save it and agreed to the transfer. Dean would have done anything at that point

---

[1] Sometime after this John assigned his interest in the debt to Plaintiff Susan Storer before he passed away.

[2] At the time of the transfer about $5,000 was owed on the Property's mortgage.

2

to save the marriage. Dean did not believe he was insolvent at this time and was generally paying his and the family's living expenses and other bills.

Before the transfer in 2016, Dean lost his job and driving privileges due to personal issues. Dean had been the primary financial provider during the marriage[3] and he and Sarah had amassed various assets over the course of their marriage. These assets included a condo in Carrabassett Valley. Dean and Sarah owned three cars together with a net value of approximately $25,000. Marital personal property totaled roughly $50,000.

Dean also owned some separate real estate. Dean had inherited the home he was residing in separately from Sarah, owned two properties as a tenant in common with his sister, and owned a small lot that he inherited individually. Dean owned an inherited one-quarter interest in the Professional Building of Damariscotta, LLC.

Dean also owned Jacobs LTC Pharmaceutical Holdings, LLC. That LLC did not operate a business, but instead owned one-quarter of another LLC, Guardian Pharmacy of Maine. Dean had owned shares in Guardian Pharmacy, but was bought out as part of a separation agreement for $1.262 million on July 14, 2016.

Dean also owned debts, including the debt to John and a home equity line of credit for just under $98,000. Sarah had no debts to speak of and no significant assets other than the marital home that Dean transferred to her.

On May 16, 2017, the District Court (Wiscasset, *Raimondi, J.*) granted the parties a judicial separation.[4] The Judgment of Judicial Separation incorporated a Marital Settlement Agreement ("MSA") of the same date executed by the parties. In its equitable division of the property, the court awarded Dean the non-marital real estate in his name,

---

[3] Dean testified credibly that before he lost his job in 2016 he earned around $450,000 in 2015.

[4] *Plummer v. Jacobs*, No. FM-2016-101 (Me. Dist. Ct., Wiscasset, May 16, 2017).

and Sarah the marital home at 85 Old County Road. The court determined that the remainder of the other property, assets, and debts had been equitably divided and allocated according to the MSA and adopted it. Specifically, the MSA addressed the marital debt owed by Dean to John's[5] estate, and the remaining funds totaling $830,000 that were paid to Dean from Guardian Pharmacy LLC as a result of the buyout.

The MSA required that the parties establish an escrow account to repay the debt to John's estate. It obligated $250,000 to Sarah as her equitable share of the marital debt to John. Out of the $830,000 in remaining funds, $165,000 was set aside to Sarah as her separate property, and $250,000 was set aside to the escrow account. The remaining funds were set aside to Dean as his separate property and a portion towards his share of the escrow account. On November 3, 2017, the District Court (Wiscasset, *Martin, Mag.*[6]) entered a Divorce Judgment.[7] A second MSA of even date was incorporated into the Judgment. The Property at 85 Old County Road was set aside to Sarah and the remaining property in Dean's name was set aside to him.

## DISCUSSION

Two Counts of Plaintiff's Complaint are before this court.[8] Count I alleges that Dean's transfers of the Property to Sarah are both fraudulent under 14 M.R.S. § 3576(1), which provides that a transfer is fraudulent under the UFTA if the transfer is made without receiving a reasonably equivalent value in exchange for the transfer and the

---

[5] The MSA refers to "Jack" Higgins. This may be a nickname or a typo but it is the same debt.

[6] Though not material to the court's decision in this matter, in the interest of transparency, the court discloses that Magistrate Martin is the undersigned justice's domestic partner.

[7] *Plummer v. Jacobs*, No. FM-2017-126 (Me. Dist. Ct., Wiscasset, Nov. 3, 2017).

[8] Count III was disposed of via a Consent Judgment dated December 13, 2018.

4

debtor was either insolvent at that time or became insolvent as a result of the transfer.[9]

Count II alleges that both the transfers were made with "actual intent to hinder, delay or defraud" the Plaintiff as Dean's creditor. § 3575(1)(A). Alternatively, the Plaintiff alleges fraudulent transfers under section 3575(1)(B). Under that theory, Plaintiff first claims that Dean received no "reasonably equivalent value in exchange for the transfer" and Dean was engaged in a transaction for which his remaining assets were unreasonably small in relation to the transaction. *Id.* § 3575(1)(B)(1). Next, Plaintiff avers that Dean received nothing in exchange for the transfer, and that he intended, believed, or "reasonably should have believed that he would incur[] debts beyond his ability to pay as the debts became due." *Id.* § 3575(1)(B)(2). Because Plaintiff's claims under sections 3575(1)(B) and 3576(1) both involve whether Dean received reasonably equivalent value in exchange for the transfers, this court first addresses whether Dean made the transfer with an actual intent to defraud the Plaintiff.

I.    **Did Dean Make the Transfers to Sarah with Actual Intent to Hinder, Delay, or Defraud the Plaintiff?**

A creditor challenging the validity of a transfer must prove by clear and convincing evidence that the conveyance was fraudulent. *Morin v. Dubois*, 1998 ME 160, ¶ 3, 713 A.2d 956. Because debtors are unlikely to admit an intent to defraud creditors, the UFTA provides a comprehensive, but not exclusive, list of factors for courts to consider in determining whether a transfer was made with the requisite intent. *Id.* ¶ 4. The factors to be considered are whether:

A. The transfer or obligation was to an insider;

B. The debtor retained possession or control of the property transferred after the transfer;

---

[9] Plaintiff indicated in her Brief on Insolvency that she is no longer pursuing the claim in Count I brought under 14 M.R.S. § 3576(2).

5

C. The transfer or obligation was disclosed or concealed;

D. Before the transfer was made or obligation was incurred, the debtor [was] sued or threatened with suit;

E. The transfer was of substantially all the debtor's assets;

F. The debtor absconded;

G. The debtor removed or concealed assets;

H. The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

I. The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

J. The transfer occurred shortly before or shortly after a substantial debt was incurred; and

K. The debtor transferred the essential assets of the business to a lienor who had transferred the assets to an insider of the debtor.

§ 3575(2).

In the case at bar, this court determines that the Plaintiff has not proven, by clear and convincing evidence, that Dean made the transfers with the intent to hinder, defraud, or delay the Plaintiff. Although some of the factors to be considered weigh in the Plaintiff's favor, they are not overwhelming. Dean did make the transfer to an insider as Sarah was his wife at the time of the transfers, but it is clear to the court that this is not a sham separation and divorce. This is evidenced by Dean's credible testimony that he would have done anything to save his marriage. Moreover, Sarah is not the typical insider but rather a sort of hostile insider. This is shown by the fact that after they separated,

6

Dean was no longer welcome in the marital home and that she also tried to attach $900,000 of his property when they were initially separated.[10]

Dean maintained possession and control of the Property after the first transfer, but never spent a night at the marital home after the second transfer. Although Dean did not specifically inform John of the transfers, he did publicly disclose them by filing in the Registry of Deeds. It is true that the second transfer came on the heels of a sheriff looking for Dean to serve him with a lawsuit from John for collection of the debt. The court determines that this transfer was not substantially all of Dean's assets. He owned other properties, including a condo with Sarah that he did not transfer to her. Moreover, he had an interest in two LLCs, which this court understands is not attachable property, but did net Dean over $1,000,000 in a cash out three days after the second transfer.

Dean did not abscond, nor did he remove or conceal any assets. Although Dean did not receive monetary value for these transfers, the first transfer was made in the interest of equity towards his wife. The second transfer had value to him as it was an attempt to save his marriage, although it failed. The court is not able, nor would it be it willing, to put a monetary value on this consideration received by Dean, but it does recognize that it had value to Dean nonetheless. Dean may have become insolvent by one

---

[10] Although this court is aware that it is Dean's intent that matters for purposes of the transfer, the court recognizes that Sarah's intent was to protect the marital home for her minor children. Despite this, this case is not like the situation in *Morin v. Dubois*, 1998 ME 160, 713 A.2d 956. There, the defendant admitted that he owed others $800,000 when he transferred what he believed to be $230,000 in assets to his son which left him without any assets after the transfers. *Id.* ¶¶ 6, 8. Here, Dean has other real property assets. There, the defendant was facing a final illness and expected high medical bills that would consume all of his resources. *Id.* ¶ 8 Here, Dean is not ill and is expected to continue working, albeit in a different career. There, the defendant filed bankruptcy a few months after the second transfer. *Id.* ¶ 2. Nothing in this case indicates Dean has, or will, file for bankruptcy. Because of these differences, even if some of Sarah's intent could be transferred to Dean because he made the second transfer in an attempt to save his marriage, it would not be enough to amount to an intent to hinder, delay, or defraud the Plaintiff.

or both of the transfers. Neither transfer occurred shortly after a substantial debt was incurred. The Property transferred was not a business asset.

After careful consideration of the UFTA factors and the trial testimony, this court determines that the Plaintiff has not proven by clear and convincing evidence that Dean's actual intent behind the transfers was to hinder, delay, or defraud the Plaintiff.

## II. Plaintiff's Remaining Claims Against Dean Under the UFTA.

Plaintiff argues that Dean's transfers to Sarah were fraudulent pursuant to the UFTA because he received no consideration in exchange for the transfers. The sections of the UFTA that Plaintiff relies on are excerpted below.

> 1. Transfers without receipt of reasonably equivalent value. A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation **without receiving a reasonably equivalent value in exchange for the transfer** or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

§ 3576(1) (emphasis added).

> 1. Fraudulent transfer. A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
> . . .
>
> B. **Without receiving a reasonably equivalent value in exchange for the transfer** or obligations and the debtor:
>
> (1) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
>
> (2) Intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as the debts became due.

§ 3575 (emphasis added).

8

At the outset, this court is mindful that these transfers happened within Dean and Sarah's marriage. However, that marriage subsequently dissolved and the District Court considered the proposed MSAs to both the Judicial Separation and the Divorce Judgment and determined that the MSAs represented an equitable division of the parties' property.[11] The Property that the Plaintiff claims was fraudulently transferred was shortly thereafter determined, when considered alongside other factors such as Sarah taking on a portion of the debt owed to John rather than giving up the home and receiving a greater portion of the cash assets, to be an equitable division of Dean and Sarah's separate and marital property. Because of that, this court is confronted with the tension between the UFTA's receipt of reasonably equivalent value provision and the family law's purpose to reach a fair, equitable, and just division of assets when a divorce occurs.

This tension is an issue of first impression in Maine. While the court recognizes that the property transfers happened before the actual legal separation and divorce, this court considers the District Court's adoption of the MSAs that divided the property as an endorsement of the transfers which effectively includes them in the Divorce Judgment.[12] Courts in other states have considered methods to alleviate these tensions. A discussion

---

[11] *See* 19-A M.R.S. § 953 (describing how in a divorce or legal separation proceeding the court is to set aside separate property and divide marital property "in proportions the court considers just" after it considers "all" relevant factors); *Doucette v. Washburn*, 2001 ME 38, ¶ 24, 766 A.2d 578 (explaining that "[a] just distribution of property is not synonymous with an equal distribution. . . . a court is not required to divide the marital property equally, but is required to make the division fair and just considering all of the circumstances of the parties.").

[12] At the time of the divorce, the Property was worth around $500,000 and was almost entirely liquid as only $5,000 was owed on the mortgage. Had the parties attempted a different division of property in which Dean kept the house, the District Court surely would have ordered him to pay some sort of other compensation to Sarah to be sure that the division of the property remained fair and equitable, especially given Dean's numerous other assets, and that Sarah had substantially nothing other than the marital home.

9

of those methods follows. It is important to note that many of these courts distinguish between "actual fraud," i.e. the fraud that is shown via actual intent in § 3575(1)(A), and "constructive fraud" which refers to transfers that are made for less than reasonably equivalent value when the debtor is insolvent, or becomes insolvent as a result of the transfer. In this case, constructive fraud would include Plaintiff's claims under §§ 3575(1)(B) and 3576(1).

### A. Placing Property Settlements Incident to Divorce Outside the Reach of Fraudulent Transfer Laws

The California Court of Appeal first confronted an attack on a property settlement pursuant to a marital dissolution in *Gagan v. Gouyd*, 86 Cal. Rptr. 2d 733 (1999). In that case, a creditor used the UFTA to challenge a transfer of assets pursuant to an MSA between a divorcing husband and wife. *Id.* at 734. The California Family Code provided that community property set aside to one spouse was not liable for a marital debt assigned to another spouse, except in certain situations. *Id.* at 737. The court determined "that a transfer of assets provided in a marital settlement agreement is not a fraudulent conveyance." *Id.* at 734. An important part of the court's reasoning was the underlying policy considerations. The court explained that

> as a matter of policy, we believe that to engraft the fraudulent transfer remedies onto a valid and approved marital settlement agreement would result in needlessly complicating the already emotionally laden dissolution process. It might result in the unraveling of a dissolution agreement painstakingly negotiated between the parties and their attorneys. We do not carry the rights of an alleged defrauded creditor that far, absent the express intent by the Legislature to do so.

*Id.* at 737.

By holding as it did, the *Gagan* court ultimately shielded fraudulent transfers from an attack by a creditor so long they were made in a divorce. The court's holding was criticized because it made it more difficult for creditors to attack property settlements

10

within divorce judgments that were blatantly fraudulent. *See* Donald Walter Sieveke, *Divorce as an Asset Protection Devise*, 45 Orange County Law 46, 50-52 (2003). Ultimately, *Gagan* did not stand for long as the California Supreme Court overruled it in 2003.

In *Mejia v. Reed*, the California Supreme Court faced a transfer of property pursuant to a marital settlement agreement. 74 P.3d 166, 168 (Cal. 2003). There, Reed had an extramarital affair with Mejia and divorced shortly thereafter. *Id.* The MSA transferred Reed's interest in jointly held real property to his wife in exchange for transfer of her interest in his medical practice. *Id.* at 168-69. Mejia challenged the transfer under the UFTA claiming that the division of property was to avoid a higher child support obligation and to hinder the collection of future child support. *Id.* After litigation in the trial court, another Court of Appeal determined, contrary to *Gagan*, that a property transfer pursuant to an MSA could be determined invalid under the UFTA. *Id.*

The *Mejia* court recognized the tension between the UFTA's permission to defrauded creditors to attach property after a transfer and the Family Code's protection of property from debts of the other spouse after it has been transferred. *Id.* at 169. In harmonizing the two statutes, it determined that the UFTA applies to all transfers, even those contained within an MSA, which some other states have also concluded.[13] *Id.* at 170. After analyzing the canons of construction applied to statutes and the legislative history behind both statutes, the court determined that neither were illustrative and that it would be required to base its decision on policy considerations. *Id.* at 173. It decided

---

[13] *See Mejia v. Reed*, 74 P.3d 166, 170-71 (Cal. 2003) for a list of cases in which different states have determined that the UFTA applies to property transfers incident to divorce. *See also Dowell v. Dennis*, 988 P.2d 206, 212-13 (Okla. Civ. App. 1999) (holding that a creditor may collaterally attack a divorce decree as fraudulent under the UFTA); *Greeninger v. Cromwell*, 915 P.2d 479, 482 (Or. Ct. App. 1996) (holding that the UFTA applies to a division of property under a divorce decree).

that because the UFTA applies to all property transfers, those that occur within a divorce should not be exempted because it could complicate marital settlement negotiations, regardless of what *Gagan* held. *Id.* Instead, the court decided that even though it might make coming to an agreement more complex, the parties' debts and how to pay them should be considered in settlement negotiations. *Id.* Therefore, the UFTA applied to property transfers under MSAs. *Id.* at 174.

Many courts have determined that the UFTA applies to property divisions under divorce judgments and MSAs. However, without a showing of actual intent to defraud a creditor, many courts have found ways to avoid applying the UFTA to those property divisions, especially when constructive fraud is alleged. The methods courts use are discussed below.

## B. Allowing a Defense of Issue Preclusion in Constructive Fraud Claims

Generally, courts are not reluctant to apply the UFTA to actual fraud cases when the defendant's intent in entering into the MSA was to hinder, delay, or defraud a creditor.[14] To reach assets in the hands of a transferee on a constructive fraud claim, the creditor must show that the debtor was insolvent or became insolvent as a result of the transfer and that the debtor did not receive a reasonably equivalent value in exchange. *See* 14 M.R.S. §§ 3576(1), 3575. As discussed prior, determining whether a debtor received

---

[14] *See Scholes v. Lehmann*, 56 F.3d 750 (7th Cir. 1995) (discussing actual and constructive fraud); *In re Williams*, 159 B.R. 648, 663 (Bankr. D.R.I. 1993) (holding that a property settlement agreement that set aside "virtually the entire marital estate" under the facts of the case showed actual intent to defraud the plaintiff); *In re Sorlucco*, 68 B.R. 748, 753 (Bankr. D.N.H. 1986) ("It is . . . clear that where a trustee can show an 'actual intent to hinder, delay, or defraud' creditors in the context of an impending bankruptcy proceeding the transfer can be voided in the divorce context."); *In re Lange*, 35 B.R. 579, 584 n.7 (Bankr. E.D. Mo. 1983) ("One has the distinct impression, while reading the facts of this case, that the transfer was malevolent, spawned and consummated in actual fraud of the husband's creditors. However, the case was not submitted on that theory.").

"reasonably equivalent value" is problematic when compared to the equitable division of assets that is necessary in a divorce proceeding. To circumvent a comparison of these two issues that come from the distinct realms of fraudulent transfer law and family law, some courts determine that issue preclusion[15] applies to a creditor's constructive fraud claim under the UFTA.

Defendants in fraudulent transfer suits maintain that litigation of whether the transfer was for reasonably equivalent value is precluded as the issue was already litigated in, and decided by, the divorce court. *See In re Falk*, 98 B.R. 472 (D. Minn. 1989). In *Falk*, a debtor ex-husband filed for bankruptcy within a year of his divorce and sued his ex-wife for return of the property transferred to her under the MSA on the grounds that he was insolvent at the time of, or became insolvent because of, the transfers.[16] *Id.* at 473. In reviewing the bankruptcy court's grant of summary judgment to the ex-wife on the grounds of issue preclusion, the district court (sitting as the appellate court), determined that "[t]he measure of reasonably equivalent value is the same measure called for in a fair and equitable division when [marital] rights and obligations are included in the balance." *Id.* at 474. The court determined that under the facts present, the

---

[15] The courts that address this matter refer to "issue preclusion," but apply a test that is more similar to claim preclusion, one component of Maine's doctrine of res judicata. In Maine, claim preclusion prohibits relitigation if:

> (1) the same parties or their privies are involved in both actions; (2) a valid final judgment was entered in the prior action; and (3) the matters presented for decision in the second action were, or might have been litigated in the first action.

*Macomber v. Macquinn-Tweedie*, 2003 ME 121, ¶ 22, 834 A.2d 131.

[16] This case addresses an allegedly fraudulent transfer in the bankruptcy context but the court's analysis is applicable to a UFTA claim. The model UFTA, including Maine's, is based on the bankruptcy code and uses the same "reasonably equivalent value in exchange" for the transfer and obligation as Maine's UFTA. *See* 11 USCS § 548(B)(i), (ii)(I)-(III).

other elements of issue preclusion were satisfied and affirmed the bankruptcy court's entry of summary judgment in favor of the ex-wife. *Id.* at 475.

Other courts followed *Falk*'s lead in allowing issue preclusion regarding whether the transfer was for a "reasonably equivalent value" on the grounds that the divorce court had already made a fair and equitable division of property.[17] Not all courts, however, have agreed that issue preclusion applies to the reasonably equivalent value provision of the UFTA and a family court's fair and equitable division of marital property.

*In re Fordu* involved a similar situation to that in *Falk,* where a non-debtor spouse claimed issue preclusion as a defense to a debtor spouse's creditor's fraudulent transfer claim. 201 F.3d 693, 696 (6th Cir. 1999). The Sixth Circuit determined that it was erroneous for the lower court[18] to enter judgment to the non-debtor spouse on the grounds of issue preclusion. *Id.* at 702. Specifically, it took issue with the lower court's determination that issue preclusion applied because the divorce judgment was a "fair, just and equitable division of the parties' marital property" and therefore the creditor was precluded "from litigating the issue of whether the Debtor received reasonably equivalent value in exchange for the transfer of his interest in the [marital property]."*Id.* at 699. The Sixth Circuit rejected the non-debtor spouse's reliance on *Falk* and *Hoyt* because "the standards for measuring the fairness of a property division in the domestic relations arena and

---

[17] *See In re Hoyt,* 97 B.R. 730, 731, 734 (Bankr. D. Conn. 1989) (quoting the bankruptcy court's decision in the Falk matter and granting summary judgment to non-debtor spouse on grounds of issue preclusion because the debtor spouse was "precluded from litigating the issue of 'reasonably equivalent value' or 'substantial consideration' for the transfers ordered by the [divorce] court . . . .").

[18] This case has a complicated procedural history winding up through the bankruptcy court and the Bankruptcy Appellate Panel before making its way to the Sixth Circuit. Because that is not relevant, this Judgment refers to the "lower court" to mean the bankruptcy court.

reasonably equivalent value in a fraudulent transfer case are separate and distinct." *Id.* at 707.

The court elaborated that

> the test used to determine whether a transfer was supported by reasonably equivalent value focuses on whether there is a reasonable equivalence between the value of property surrendered and that which was received in exchange. [Divorce] courts, in making a division of property, are not constrained by a reasonable equivalence standard. Rather, they may take into account a number of equitable factors that conceivably could produce a division of marital property that would satisfy the requirements of [the family law statutes] yet not pass muster under the reasonable equivalence test. Given these divergent decisional standards, we believe that the [divorce judgment] cannot be accorded claim-preclusive effect.

*Id.* at 708. Due to the split among courts about whether issue preclusion may validly apply to bar a UFTA claim against a divorce decree that was determined to be a fair, just, and equitable division of marital property, some courts embrace a "surface determination test" as described below.

## C. Applying a Surface Determination Test in Constructive Fraud Claims

Courts addressing fraudulent transfer claims regarding distribution of property in a divorce are wary of taking on "de novo divorce jurisdiction," more specifically, they are not inclined to "reexamine and redetermine the balancing of various choate and inchoate marital rights and interests in property -- to determine whether what the nondebtor spouse 'gave up' was equal to what that spouse received as a result of the divorce decree." *In re Sorlucco*, 68 B.R. 748, 753 (Bankr. D.N.H. 1986). *Sorlucco* involved a claim by a bankruptcy trustee against a non-debtor spouse's property that she received in a property settlement at the time of her divorce from the debtor. *Id.* at 749-50.

There, the court was confronted with a legitimate appearing divorce judgment in which the non-debtor spouse, for noneconomic reasons, asked for less than she was entitled to under the equitable distribution divorce law. *Id.* at 750. The creditor did not

15

allege actual fraud under the Bankruptcy Code, but instead, constructive fraud. *Id.* at 753.

In trying to reconcile the conflicting policies, the court determined that Congress's use of

"'*reasonably* equivalent value' has provided sufficient flexibility for reconciling the

different public policy purposes between the state [family] laws and federal [fraudulent

transfer] laws." *Id.* The court opined that

> the bankruptcy standard in this context should be interpreted to require only a 'surface determination' by the bankruptcy court that the division of marital property between the divorcing parties was within the range of likely distribution that would be ordered by the state divorce court if the property division had actually been litigated in that state court.

*Id.* The court reasoned that Congress could not have intended bankruptcy courts to

"reexamine and redetermine" divorce judgments anew. This is because to do so

> would be exactly equivalent to the function of the divorce court in making a sophisticated and refined analysis as to the history of the marriage, the circumstances of the parties, their individual future prospects, and all other factors impinging upon the marital rights of the parties consistent with the family law policies of the state involved. Such would be required before any meaningful determination of what the nondebtor spouse 'gave up' in the divorce settlement could be made.

*Id.* at 754. The surface determination approach still allows a creditor to attack a property

distribution if it can show actual intent to defraud. *Id.* at 755. However, on a constructive

fraud claim, a property settlement that was a fair and equitable distribution of assets

would not be subject to attack if it was shown that "the property division was the result

of arms-length bargaining in the light of the likely range of distribution that the divorce

court might order if the matter went to a contested trial." *Id.* The court decided that the

surface determination test struck the appropriate balance between a "fair and equitable

division of property" in a divorce and the "reasonably equivalent value" concept under

fraudulent transfer law that allowed creditors to claim actual fraud to pursue debtors,

16

while leaving the judgment of a divorce court intact in constructive fraud cases by not undertaking de novo divorce jurisdiction.

### III. The Case at Bar.

All of the above methods have met criticism. Removing property transfers incident to divorce from the realm of fraudulent transfer law created a safe haven for would-be divorcees who actually intended to defraud creditors. The issue preclusion method simplifies the concepts of a transfer for reasonably equivalent value and a fair and equitable distribution of property under an MSA and treats them as the same thing, when there are some differences between the concepts. Though the differences may be subtle, they are there and apparent when trying to compare: (1) what the family law court determined was a fair, just, and equitable division of marital property between two spouses, and (2) whether there was reasonable value given for a transfer of property. The division of a marital estate is just that – taking a whole and dividing it. A transfer is an exchange from one party to another.

The surface determination test advanced by *Sorlucco* has been criticized as "a policy-based decision that usurps the legislative prerogative" because had Ohio's legislature "seen fit to exempt court-approved property divisions from challenge as constructive fraudulent transfers, it could have expressly done so." *In re Fordu*, 201 F.3d 693, 709 (6th Cir. 1999). It has also been criticized for the same reasons as the issue preclusion method, specifically that it is trying to equate two issues that are substantively different. Moreover, the equitable division of marital property requires a subjective analysis. In contrast, whether reasonable value has been given for a transfer is more of an objective analysis that compares dollars received to a piece of property's dollar value.

To not apply any of the above methods to cases such as this one would require a case by case analysis of every UFTA challenge to a property transfer incident to divorce.

17

It would require this court to review the district court's judgment and go through everything set aside to each spouse, from marital homes to personal property, and determine if, after the division, the debtor spouse received reasonably equivalent value, in the monetary sense, in exchange for the property. The UFTA should be available as a means to attack a fraudulent transfer of property made during a divorce if actual intent to defraud can be shown. This protects creditors. However, this court is not of the opinion that the UFTA intended to open a legitimate property settlement incident to divorce to attack as a constructively fraudulent transfer.

To allow creditors to pursue a constructive fraud theory in attacking property divisions under MSAs would leave non-debtor spouses unprotected as the entire transaction could be voided for lack of reasonably equivalent value. In many cases it would be simple for a creditor to show that the MSA resulted in the debtor spouse having less property after the divorce than he had before the divorce, and that he didn't receive reasonably equivalent value, as the term is defined by the UFTA. Those transfers could then be voided to the detriment of the non-debtor spouse, when neither spouse had an actual intent to defraud, hinder, or delay a creditor, but instead, needed a divorce. If the property transfer were set aside as constructively fraudulent, then the fair, just, and equitable division of the marital property that the District Court made would no longer exist, especially in regards to the non-debtor spouse.

This court determines that the UFTA's provisions on constructively fraudulent transfers do not apply to property settlements incident to divorce. This would not stop a creditor from pursuing a claim of actual fraud against a debtor regarding a division of marital property. It is unlikely that most divorces are a device of deception for the

18

purpose of defrauding creditors. As such, Plaintiff's remaining claims against Dean and Sarah under a constructive fraud theory must fail.[19]

Moreover, Sarah received the Property as part of the MSA in which she gave up other valuable consideration, including other real property and part of a substantial cash asset. Because of this, Dean did receive reasonable value in exchange for the Property. Given the economic circumstances of this divorce, had Sarah not been awarded the marital home in the MSA, Dean surely would have had to have given up his share of other real estate, or part of the cash asset to make a fair, just, and equitable division of marital property.[20]

## CONCLUSION

Judgment is entered for Defendants on Counts I and II of the Complaint.

The Clerk is directed to incorporate this Judgment by reference into the docket for this case pursuant to Maine Rule of Civil Procedure 79(a).

Dated: May 21, 2019

Daniel I. Billings, Justice
Maine Superior Court

Entered on the Docket: 5/21/19

---

[19] Although the transfers at issue in this case happened before the divorce, as discussed previously, neither transfer was made with the intent to hinder, delay, or defraud the Plaintiff. Additionally, the Property itself, the marital home, was addressed by the MSAs and determined to be a fair and equitable division.

[20] If this court were to apply the surface determination test, which is the most acceptable out of the three, the outcome would be the same. The division of marital property between Dean and Sarah was within the range of what would have been awarded by the District Court had it gone to contested hearing.

19